MESSRS. JUSTICES COTHRAN, BLEASE and CARTER concur.

MR. CHIEF JUSTICE WATTS dissents.

---

12493

BLEASE *ET AL.*, STATE RAILROAD COMMISSION v.
CHARLESTON & W. C. RAILWAY COMPANY

(144 S. E., 233)

1. MANDAMUS—SUPREME COURT MUST BE GUIDED BY RULE OF REASON, ON PETITION FOR MANDAMUS COMPELLING RAILWAY COMPANY TO RESTORE CERTAIN TRAINS.—In proceeding for writ of mandamus compelling railway company to comply with Railroad Commission's

NOTE: On the question as to whether mandamus will lie to compel railroad company to comply with order of Commission, see annotation in 13 L. R. A. (N. S.), 322; 18 R. C. L., 151; 3 R. C. L. Supp., 790.

order to restore certain trains, Supreme Court must be guided by the rule of reason in the circumstances, with facts in record.

2. MANDAMUS—EVIDENCE IN MANDAMUS TO RESTORE TRAINS HELD TO SHOW THAT NEW SCHEDULES FURNISHED REASONABLE PASSENGER, MAIL, AND EXPRESS SERVICE.—Evidence in proceedings for writ of mandamus compelling railway company to comply with Railroad Commission's order to restore certain trains *held* to show that new schedules furnished reasonable mail and express, as well as passenger, service in the circumstances.

3. EVIDENCE—COURT TAKES JUDICIAL NOTICE THAT BUSSES ARE OPERATED BETWEEN CERTAIN CITIES, AND THAT CERTAIN CITIES ARE RAILROAD CENTERS.—On petition for writ of mandamus to compel railway company to comply with Railroad Commission's order to restore certain trains, Supreme Court will take judicial notice of fact that busses are operated from Spartanburg to Greenwood, S. C., and from Greenwood to Augusta, Ga., and that Greenwood and Laurens are railroad centers.

4. EVIDENCE—IT MUST BE ASSUMED, IN MANDAMUS TO RESTORE TRAINS, THAT POST OFFICE DEPARTMENT WILL SUPPLY ADEQUATE MAIL SERVICE ON DEMAND.—On petition for writ of mandamus to compel railway company to comply with Railroad Commission's order to restore certain trains, it must be assumed that, if any section does not receive its mail promptly, the Post Office Department will discharge its duty, and supply adequate service on demand.

5. RAILROADS—FAILURE OF PEOPLE ALONG RAILWAY LINE TO APPEAR AT RAILROAD COMMISSION HEARING AND OBJECT TO REMOVAL OF TRAINS MUST BE CONSTRUED AS ACQUIESCENCE THERETO.—Failure of people along line of railway company to appear at hearing before Railroad Commission, offer testimony, and make objection to removal of trains, must be construed as acquiescence to removal thereof.

6. JUDGMENT—COURTS MUST DECIDE CASES ON TESTIMONY.—Courts must decide cases on the testimony.

7. CARRIERS—RAILWAY COMPANY IS ENTITLED TO REASONABLE PROFIT ON INVESTMENT.—A railway company is entitled under the law to realize a reasonable profit on its investment.

8. CONSTITUTIONAL LAW—REQUIRING RAILWAY COMPANY TO RESTORE CERTAIN TRAINS HELD CONFISCATORY, AND TAKING OF PROPERTY WITHOUT DUE PROCESS (CONST. U. S., AMENDS. 5, 14; CONST. S. C., ART. 1, §§ 5, 17).—Evidence, on petition for writ of mandamus compelling railway company to comply with Railroad Commission's order to restore certain trains, *held* to show that such requirement would entail such a loss on company as to be confiscatory of its property, and taking thereof without due process of law, in viola-

tion of Const. U. S., Amends. 5, 14, and Const. S. C., Art. 1, §§ 5, 17.

9. CONSTITUTIONAL LAW—"CHARTER" IS CONTRACT BETWEEN CORPORA-TION AND STATE.—The "charter" of a corporation is a contract between it and the State.

10. CONSTITUTIONAL LAW—LEGISLATIVE GRANT IS "CONTRACT," WITHIN OBLIGATION CLAUSE OF CONSTITUTION.—A legislative grant is a "contract" within the obligation clause of the Constitution.

11. RAILROADS—RAILROAD CORPORATION IS BUSINESS CORPORATION, WHICH CANNOT BE DENIED JUDICIAL INVESTIGATION OF QUESTION OF CONFIS-CATION OF ITS PROPERTY.—A railroad corporation is a business corporation, which cannot be denied a judicial investigation of the question as to confiscation of its property.

12. RAILROADS—RAILROAD COMMISSION'S ORDER THAT RAILWAY COMPANY RESTORE CERTAIN TRAINS IS SIMPLY LEGISLATIVE.—Order of Railroad Commission that railway company restore certain discontinued trains is simply legislative.

13. RAILROADS—REASONABLENESS OF RAILROAD COMMISSION'S ORDER THAT RAILWAY COMPANY RESTORE CERTAIN TRAINS IS JUDICIAL QUESTION. —Whether order of Railroad Commission that railway company restore certain discontinued trains is reasonable is a judicial question.

14. RAILROADS—FAILURE TO PROVIDE FOR COURT INVESTIGATION DOES NOT INVALIDATE RAILROAD COMMISSION'S ORDER TO RESTORE TRAINS.—Failure of Railroad Commission to provide for investigation by Courts in its order that railway company restore certain discontinued trains does not make such order void, as Courts have such power anyway.

15. CONSTITUTIONAL LAW—RAILWAY PROPERTY DEVOTED TO INTRASTATE PASSENGER SERVICE CANNOT BE CONFISCATED, MERELY BECAUSE ANOTHER BRANCH OF COMPANY'S BUSINESS IS REASONABLY PROFIT-ABLE.—State cannot justify confiscation of railway property devoted to intrastate passenger service merely because some other branch of company's business, state or interstate, is reasonably profitable.

16. RAILROADS—RAILROAD CORPORATION SHOULD BE GUARDED AGAINST UNDUE ENCROACHMENT, WITHOUT FULL INVESTIGATION, AND NECES-SITY THEREOF CLEARLY ESTABLISHED, WITHOUT CONFISCATING ITS PROPERTY.—While a railroad corporation has only restricted power in management of its business affairs and property, since Congress and State Legislature enact laws on subject and Interstate Commerce Commission and State Railroad Commission promulgate rules and regulations, it should be guarded against undue encroachments, without full investigation, and necessity thereof for reasonable public service clearly established, without confiscating its property.

In the original jurisdiction. December, 1927. Petition dismissed.

Proceeding by Sam C. Blease and others, constituting the Railroad Commission of South Carolina, for a writ of mandamus to compel the Charleston & Western Carolina Railway Company to comply with an order of such commission to restore certain trains.

*Attorney General John M. Daniel,* and *Assistant Attorney Generals J. Ivey Humphrey* and *Cordie Page,* for petitioners, cite : *Power of Railroad Commission to determine if reasonable service rendered:* 71 S. C., 130; 74 S. C., 80; Sec. 4953, Code. *State has power to provide for convenience of public:* 173 U. S., 285; 206 U. S., 1; 216 U. S., 262; 267 U. S., 493; 244 U. S., 388. *Commission had power to pass order:* 244 U. S., 574; 267 U. S., 330; 251 U. S., 22; 449 U. S., 422; 249 U. S., 416.

*Messrs. F. B. Grier, B. A. Hagood,* and *W. S. Nelson,* for respondent, cite : *Power and authority of Railroad Commission:* Ar. 9, Sec. 14, Const. 1895. *Power must be exercised in a reasonable manner:* 131 S. C., 144; 265 U. S., 70; 244 U. S., 388; 238 U. S., 491; 236 U. S., 585; 224 U. S., 510; 207 U. S., 328; 173 U. S., 684; 216 Fed., 252; 85 So., 663; 53 So., 660; 251 U. S., 326; 145 Fed., 282. *As to determination of reasonableness:* 252 U. S., 100; 255 U. S., 539; 206 U. S., 151; 216 U. S., 262. *Order here void because no provision made for judicial review of same:* 253 U. S., 287; 12 C. J., 1241; 249 U. S., 422; 211 U. S., 210; 253 U. S., 287; 87 S. C., 290; 12 C. J., 808.

August 14, 1928.

The opinion of the Court was delivered by MR. ACTING ASSOCIATE JUSTICE J. WM. THURMOND.

This proceeding was instituted by the Railroad Commission of the State of South Carolina, in the original jurisdiction of this Court, for the issuance of a writ of mandamus

to compel Charleston & Western Carolina Railway Company
to comply with order No. 370 of said Railroad Commission,
and for such other and further relief as may be just and
equitable, signed by the Attorney General and members of
his staff, and dated November 22, 1927. The said order is
made a part of the petition, and reads as follows:

"October 6, 1927.

"ORDER No. 370 .

"In re the discontinuance of trains Nos. 2, 3, 7, 45, and
46 by the Charleston & Western Carolina Railway Company.
This is an application on behalf of the public for the restora-
tion of the service heretofore rendered by trains Nos. 2,
3, 7, 45, and 46, operated by the Charleston & Western
Carolina Railway Company. Trains 2, 3, and 7 were oper-
ated between the City of Augusta, in the State of Georgia,
and the City of Spartanburg, in the State of South Caro-
lina; and trains Nos. 45 and 46 were operated between the
City of Augusta, in the State of Georgia, and the Town
of Yemassee, in the State of South Carolina. Each of
these trains carried passengers, mail, and express. .

"On the ground that these were interstate trains, and were
being operated at a loss, the railway company discontinued
their operation without the authority of this commission.
Some communities along these roads complained, and alleged
that the service now being rendered by this railroad for the
purpose above stated to the public is inadequate. A hearing
was had upon the matter at Columbia, S. C., on the 18th
day of May, 1927, and thereafter, on August 10th, the case
was reopened and further testimony taken, and the com-
mission has had the matter under consideration since that
time.

"The testimony shows that in many localities served by
this railroad the service now being rendered is inadequate.
The weight of the testimony was not so much upon the
inadequacy of the passenger service alone, as it was upon

the inadequacy of the combined passenger, mail, and express service. It was argued that this commission had no authority to order the operation of additional passenger trains, unless the demands of the passenger traffic, considered alone, would warrant it; that the matters of the transportation of mail and express were between the railroads and the federal authorities, on the one hand, and between the railroads and the express companies, on the other. We have given much consideration to this position. Under the showing made of the passenger earnings of these trains, the demands for additional passenger service alone might not warrant an order requiring the operation of additional train service; but this railroad, as well as nearly all other railroads, operate their passenger trains, not alone for the transportation of passengers, but for` the transportation of passengers, mail, and express. These combined services they have undertaken to perform, and have been performing, practically ever since railroads have operated, so long, in fact, that the operation of a passenger train means to the public mind the transportation of passengers, mail and express. The railroads have invited the public to expect this combined service, and to depend upon it. They have helped to create this state of mind, and upon it have procured valuable rights from the public.

"Business and the whole social structure expect, and have a right to expect, that service performed by them. Large investments have been made, enterprises launched, and obligations created upon that confidence, and the obligation to render this service is without a doubt a part of their charter obligations. Can a railroad abruptly withdraw that service, with its consequent shock to the affected organizations of business and of society, and say that the public can test their duty only by the demands of the passenger traffic, considered alone? In other words, is it sufficient justification for the withdrawal of that service to show that these trains are operated at a loss? In the case of *Milwaukee Electric Railway*

*Co. v. Milwaukee,* 252 U. S., 100; 40 S. Ct., 306; 64 L. Ed., 476; 10 A. L. R., 892, the Court held the financial condition of a public service corporation is a fact to be considered in determining the reasonableness of an order directing an unremunerative extension of facilities, but added that there was no warrant of law for the contention that, due to mere failure to earn the full 6 per cent. upon the value of the property used, the company can escape their obligations voluntarily assumed, or burdens imposed in the ordinary exercise of the police power. It seems to us that the whole service to be performed should be considered in determining the matter before us, and the obligations of a railroad company to render what appears to us to be a reasonable service should be controlling, rather than the question of whether or not the service is remunerative.

"Again, the showing is that this railroad is making money on its freight business, and, while it is losing money on its passenger business, at the same time the net result of its entire operation is profitable. The point is made that we are not authorized to consider the freight earnings of this company in determining the issue before us. Perhaps we could not determine it alone upon the showing that the freight business is profitable; but this is a public utility, and its duty is to render to the public adequate service in all of the departments included in its undertaking. While one branch may not be profitable, yet, if that one involves a service which should be performed, we may consider the profits derived from the whole unit, in determining the measure of service to be rendered by the unprofitable branch.

"There was some passenger business done by the trains that were discontinued, and when the demand of that traffic is combined with the demand for additional mail and express service we are warranted in concluding that the service for all of these purposes combined is inadequate, and in ordering a restoration of the service in South Carolina that was discontinued.

"Technically these are interstate trains, but substantially they are intrastate trains, for the entire territory served by them, except the City of Augusta and about 23 miles in the State of Georgia, is in the State of South Carolina; but conceding, for the purpose of argument, that we have no jurisdiction to order these particular trains back into operation, we have the jurisdiction to order the Charleston & Western Carolina Railway Company to render that adequate service to the communities in South Carolina traversed by its lines which arises from obligations voluntarily assumed and required by its charter. *Mo. Pac. Railway Co. v. Kansas,* 216 U. S., 262; 30 S. Ct., 330; 54 L. Ed., 472. *Railroad Commission of Wisconsin v. Chicago & Northwestern Railway Co.,* 87 I. C. C., 195.

"The station of Beach Island, on this railroad, is the station in South Carolina on its Yemassee & Augusta road nearest the South Carolina line, and is nine miles from the City of Augusta, and the station of Woodlawn is the station on its Augusta & Spartanburg road in South Carolina nearest the State line, and is 16 miles from the City of Augusta, and for the reasons above stated we shall order trains operated upon substantially the schedules governing the trains removed between Yemassee and Beach Island, and between Spastanburg and Woodlawn.   It is

"Ordered that the Charleston & Western Carolina Railway Company operate passenger, mail, and express trains from Yemassee, S. C., to Beach Island, S. C., upon its lines, upon the same or substantially the same schedules formerly governing the operation of trains Nos. 45 and 46, and that it operate such trains between the City of Spartanburg and Woodlawn, S. C., over its lines, upon the same or substantially the same schedules as governed the operation of trains Nos. 2, 3, and 7, and that this service be commenced not later than the 23d day of October, 1927.

"By order of the commission:

"SAM C. BLEASE, Chairman.

"J. P. DARBY, Secretary."

17—S. C. R.—146

The return and answer to the petition by the respondent Charleston & Western Carolina Railway Company is as follows:

### "RETURN TO PETITION AND ANSWER

"Charleston & Western Carolina Railway Company, respondent, by way of return to the petition herein and answer respectfully shows unto the Court:

"1. It admits the allegations of paragraph 1 of the said petition.

"2. It admits that respondent is a railway corporation organized and existing under the laws of the State of South Carolina, as alleged in paragraph 2, but denies the remaining allegation of the said paragraph; that is to say, that it is now operating, or at any time has ever operated, a train from Yemassee, S. C., to Beach Island, S. C., or from Spartanburg to Woodlawn, S. C., except in passing these stations en route from Yemassee to Augusta, and from Spartanburg to Augusta, and in further reference to the allegation of paragraph 2, it alleges that this respondent is an interstate carrier operating a line of railroad between the City of Spartanburg, in the State of South Carolina, and the City of Augusta, in the State of Georgia, which line of railroad passes through Woodlawn, S. C., near the Georgia line, and a line of railroad from the town of Port Royal, S. C., via Yemassee and Beach Island, to the City of Augusta, in the State of Georgia; that the Towns of Yemassee and Beach Island and the Town of Woodlawn are merely stations on its line of railroad through which the trains pass en route from Spartanburg to Augusta and from Augusta to Port Royal.

"3. It denies the allegation of paragraph 3, alleging that in the month of April, 1923, respondent requested the Railroad Commission of South Carolina to discontinue certain passenger trains between the stations of Yemassee and Beach Island and between the City of Spartanburg and Woodlawn,

S. C., and in reference thereto alleges that at the time mentioned in said paragraph 3, it did petition or request the said Railroad Commission of South Carolina for permission to discontinue the operation of certain passenger trains between the City of Spartanburg, S. C., and Augusta, Ga., and between Yemassee, S. C., and Augusta, Ga.   It admits that this petition was refused by the Railroad Commission of South Carolina, and that subsequently another request was made in July, 1925, to the Railroad Commission of South Carolina to discontinue said trains referred to above, and that the Railroad Commission of South Carolina, after consideration, passed an order dismissing the petition.   In this connection respondent alleges that it was advised by the then chairman of the Railroad Commission that, after due consideration, the Railroad Commission reached the conclusion that, since the trains were interstate, the South Carolina Railroad Commission was wholly without jurisdiction, and for this reason and on this ground dismissed the petition in the order above referred to.   Respondent further avers that since that time the personnel of the Railroad Commission has changed, and the status of respondent's passenger service operations has changed, in that, although operating costs have increased, respondent's revenue from passenger operations and allied service have enormously decreased since April, 1925.

"4. This respondent denies the allegation of paragraph 4, alleging that it has ignored or treated with contempt any order or orders of the Railroad Commission of South Carolina, or that it has acted in disregard of its charter obligations and the duty which it owes to the public, as alleged in paragraph 4 of the said petition.   It denies that the citizens and public along its line of railway are without adequate train service or facilities, but, on the contrary, avers that the service being rendered the public by the defendant is entirely adequate and sufficient to meet the needs and demands of the public.   It admits that after the discontinuance of certain

of its passenger trains public hearings were had by the Railroad Commission of South Carolina in May, 1927, and in August, 1927, but denies that the purpose of the said hearing was to require respondent to show cause why the discontinued trains should not be restored, but, on the contrary, avers and alleges that the purpose of the said hearings was to afford the public an opportunity to show whether or not any additional service was needed, or that the service then being furnished was inadequate, and alleges that the public at the said hearing utterly failed to show any need or occasion for additional passenger service, or that the service then being furnished was not entirely adequate to meet the needs and requirements of the public. In further reference to the allegations of paragraph 4, respondent alleges that prior to the time it discontinued the trains designated and referred to in order No. 370, to-wit, between Augusta and Spartanburg and between Augusta and Yemassee, it had an informal conversation or conference with the Railroad Commission of South Carolina on the 6th day of April, 1927, and explained and stated to the commission that the public was not using its passenger train service, and the same were being operated at an enormous loss of revenue, which was growing daily, and to such extent that respondent was forced to curtail its passenger service, which was not needed and not being made use of by the public so as to minimize to a certain extent its growing and enormous losses; that at this informal conference or conversation respondent explained that it was not asking the Railroad Commission to authorize its taking off the trains, but out of deference to the commission wished the commission to understand that it was forced to discontinue the trains referred to, and while the commission did not pass any formal order, and was not requested so to do, it was stated that, if there was complaint made by the public, or any one interested, it would hold a public hearing and inquire into the adequacy of the service being rendered by respondent after the discontinuance of the

trains in question, and acting on this understanding respondent gave due and legal notice of its intention and purpose to discontinue certain trains on a day named; that thereafter, on the 22d day of April, 1927, respondent received a telegram from the chairman of the commission reading as follows:

" 'Commission is informed of your intention to discontinue operation passenger trains two, three, seven, forty-five and forty-seven you are directed to continue operation these trains until permission of this commission is secured see sections forty-nine, fifty-three and fifty-four Code of Laws Nineteen Twenty-Two. Sam C. Blease, Chairman Railroad Commission of South Carolina.'

"In reply to this telegram respondent wired the commission as follows:

" 'Replying to your telegram received late this afternoon. You of course recall the conference between the commission Mr. Grier and me on Wednesday the sixth at which time we had a full understanding as to our plans. Our schedules have been distributed among our train service employees, published notice has been posted as to our changes and we are now without serious risks unable to recall our new schedule figures and there is no other safe course left to us. We shall be very glad at such time as you may feel necessary respond to any hearing that you may order on the subject of our passenger train service.

" 'A. W. Anderson.'

"To the last-named telegram the chairman of the commission wired the respondent as follows:

" 'Our wire this date refers only to the intrastate operation your trains between points in South Carolina.

" 'Sam C. Blease, Chairman.'

"Respondent therefore alleges and avers that at no time has it shown any disposition to disregard or ignore any of the orders of the Railroad Commission or its duty to the public, but at all times has treated with the greatest deference and respect all the orders of the Railroad Commission.

and where possible to do so has complied with the orders and requests of the Railroad Commission.

"5. That respondent has no knowledge or information sufficient to form a belief as to the allegations of paragraph 5, and therefore neither admits nor denies the same.

"6. Further answering the said petition, and by way of return thereto, respondent alleges that before the effective date of order No. 370 above referred to, to-wit, on October 13, 1927, respondent, having no right of appeal or other statutory means of reviewing the said order in the State Courts, filed its bill in equity and application for temporary restraining order and interlocutory injunction to enjoin and restrain the enforcement of the said order before the Judge of the District Court of the United States for the Eastern District of South Carolina, upon the ground that the said order was null and void, in that it deprived respondent of its property without the process of law, denied to respondent the equal protection of the laws, placed an undue burden on interstate commerce, and was, therefore, in conflict with and in violation of the Constitution and laws of the United States, and that thereupon, after due hearing, at which the Railroad Commission of South Carolina was represented by the Attorney General of the State of South Carolina, the said United States District Court issued its order temporarily restraining the enforcement of said order and calling a three-Judge Court under the provision of the United States judicial code in that behalf, and that such action is still pending before that Court.

"7. Respondent respectfully avers and alleges that the said order was passed without any legal cause, justification, or excuse for or legal evidence to support the same, and that it is null and void and of no force or effect, in that, if it is enforced, it will deprive this respondent of its property without due process of law and would deny it the equal protection of the laws, in violation of the Constitution and laws of the United States, and particularly the Fifth and Fourteenth

Amendments to the said Constitution, and of Article 1 of Section 5 of the Constitution of the State of South Carolina; that it will place an undue burden upon interstate commerce, in violation of the laws of the United States, will amount to a confiscation of plaintiff's property, in violation of said laws and Constitution, and in violation of Section 17 of Article 1 of the Constitution of the State of South Carolina.

"8. That attached hereto as an exhibit to this return and answer, and made a part hereof, is a copy of the printed record filed by respondent in the District Court of the United States for the Eastern District of South Carolina, which record contains the entire transcript of evidence and exhibits taken before the Railroad Commission of the State of South Carolina at its hearing in May and August of 1927, and upon which said order No. 370 is based.

"Wherefore respondent, having fully answered, respectfully prays that the petition be dismissed, and that the said order No. 370, of the Railroad Commission of South Carolina may be declared to be in violation of the constitutional rights of this respondent, illegal, invalid, null, and void, for each and all of the reasons hereinbefore set out. Charleston & Western Carolina Railway Company, by F. B. Grier, B. A. Hagood, W. S. Nelson, its Attorneys."

This petition was verified by A. W. Anderson, vice president and general manager of Charleston & Western Carolina Railway Company.

It will be observed that the issue between the petitioner and respondent is: The petitioner contends that it is entitled to a writ of mandamus to compel the respondent to comply with said order No. 370; and the respondent denies the right of the petitioner to said writ of mandamus, upon the grounds that it is in violation of the Constitutional rights of the respondent, and is illegal, invalid, null and void, for the reasons set out in the return and answer.

Article 9, § 14, of the .Constitution of South Carolina, the fundamental law of this State, creates "the Railroad Commission," whose powers over all transporting and transmitting corporations and duties, manner of election, and term of office are regulated by law.  In view of the Court's opinion in this case, it is not necessary to decide whether to order the trains mentioned restored, as demanded by the petitioner, would be a burden on interstate commerce and a regulation thereof, or not.

Is the respondent furnishing reasonable train service for the public on its line between Spartanburg and Meriwether, and between Yemassee and Beach Island? is the question before this Court for decision.  The guide of this Court must be the rule of reason in the circumstances, with the facts appearing in the record.

The petitioner offered as witnesses Hon. W. H. Lightsey, of Hampton County, Congressman Hare of the second congressional district, and Thos. J. Hamilton, editor of the Augusta Chronicle, and J. L. Erwin, all of whom testified of numerous complaints made of train service of the Charleston & Western Carolina, between Augusta, Ga., and Yemassee, S. C., and especially in the sections of Fairfax, Brunson, Hampton, and Varnville, and that they are familiar with conditions in those sections.

Before trains 45 and 46 were removed, the morning down train from Augusta, Ga., arrived at Brunson at 7 a. m., and returned to said town at about 3 p. m., and the northbound morning train from Port Royal passed Brunson about 9:50 a. m., for Augusta, and returned that afternoon at Brunson at 4:15 p. m., and after the removal of these trains one passenger train a day each way rendered the service of carrying passengers, mail, and express, and it left Port Royal early in the morning, and arrived at Brunson about 9:50 a. m., and returned to Brunson about 4 p. m., making connection at Yemassee with the Atlantic Coast Line.  The demand for passenger service on said line of railroad is very

light, and it seems to be admitted that the passenger service is adequate, but the mail and express service was interrupted by the new arrangement along that line of railroad from Fairfax to Yemassee, causing delays in the mail, especially on the R. F. D. routes.

It seems that the principal truck grown from Beach Island to Yemassee consists of potatoes, melons, cucumbers, and a small quantity of beans. The witnesses for the petitioner say there are many complaints of the service on that railway, directed mainly against delay in delivery of the mail and carriage by express of potatoes, cucumbers, and beans in less than carload lots. W. H. Lightsey testified that this service had been very much interrupted and is a handicap to the farmers, truckers, and merchants, and Congressman Hare agrees with him.

The respondent offered as witnesses its vice president and general manager, A. W. Anderson, its trainmaster, A. W. Wallace, and two farmers and successful business men from that section, to wit, Hon. Fred Lightsey, of Crocketville, about four miles from Hampton, and W. I. Johns, north of Allendale, a director of said railway company. Mr. Hamilton, of the Augusta Chronicle, withdrew his objections to the removal of said trains. Mr. Erwin, of Columbia, was only interested in the prompt delivery of The State (newspaper) in those sections.

The testimony of Mr. Fred Lightsey shows that objections on the account of the delay in the delivery of the mail had been eliminated, and he stated that the conditions down there are now satisfactory, and nobody seems inconvenienced by the taking off of trains 45 and 46, and the papers, the Augusta Chronicle and The State, are now delivered by a star route from Augusta to Allendale and to Yemassee; that Blackville is a great cucumber market, and most of the cucumbers go to Blackville, and automobiles and trucks are used to a large extent in that section for moving vegetables from place to place.

Mr. Johns testified that little express of vegetables was moved on the two trains taken off, for they could not get them ready by 7 o'clock going east. The afternoon train, with present schedule, would take truck to Yemassee and deliver to the Coast Line, and the truck could be gathered in the morning and shipped in that direction on the afternoon train.

In this day of aggressive business methods, our people in the country should get their daily papers certainly by midday of the day they are published. It appears that the people near this line of railroad are getting adequate mail service by the star route aforesaid, and that carload shipments are entirely satisfactory, and that the connection at Yemassee with the Atlantic Coast Line, by the train leaving Augusta at 2 o'clock p. m., gives the farmers and truckers along that line of railroad fine service for the shipment of their truck to the Northern and Eastern markets.

The following official figures show the passenger business for seven years, ending with 1926, to wit:

| | |
|---|---|
| 1920 | 866,162 |
| 1921 | 549,968 |
| 1922 | 471,181 |
| 1923 | 456,968 |
| 1924 | 364,416 |
| 1925 | 290,838 |
| 1926 | 248,221 |

Statement showing loss from operation of trains enumerated for period April 1 to 23, inclusive, 1927:

| | |
|---|---|
| Train 2 | $ 3,217.61 |
| Train 3 | 1,711.02 |
| Train 7 | 1,539.25 |
| Train 45 | 1,748.74 |
| Train 46 | 1,992.62 |
| | $10,209.24 |

The total valuation of the property of the Charleston & Western Carolina Railway Company is $13,334,427. The employees of said railway have increased from 1,193 in 1917 to 1,408 now.

The net return on freight for certain years follows:

| | |
|---|---|
| 1917 | $473,528 |
| 1920 | 636,000 |
| 1921 | 533,000 |
| 1926 | 335,000 |

The representative of Spartanburg stated at said hearing that the objection he had to taking off Trains 1, 2, and 7, was that Charleston & Western Carolina Railway did not have permission of the Railroad Commission to do so. We do not believe that said railway company meant to treat with contempt the order of the South Carolina Railroad Commission, but simply exercised its rights under the law to protect its property; and whether the railroad's action was justified depends upon the character of service rendered by it to the public, in view of the patronage given it by the public, and the writer believes the new schedules furnish reasonable service in the circumstances.

Only one witness living near said line of railroad, Representative W. H. Lightsey, testified at the hearing before the Railroad Commission, and offered objections to the removal of said trains, and he did not seem to be aware that a star route had been authorized from Augusta to Yemassee. No witness from Meriwether to Spartanburg testified at said hearing and objected to the removal of said trains.

The Court will take judicial notice of the fact that busses are operated from Spartanburg to Greenwood, and from Greenwood to Augusta, and that Greenwood and Laurens are railroad centers.

Of course, the delivery of mail is controlled by the Post Office Department, and if any section does not receive its mail promptly it must be assumed that

the Post Office Department will discharge its duty and have adequate mail service supplied upon demand.

The failure of the people along the line of said railway company from Augusta, Ga., to Spartanburg, S. C., to appear at said hearing before the Railroad Commission and offer testimony, and make objections to the removal of Trains 1, 2, and 7, must be construed as acquiescence on their part to the removal of said trains.

Courts must decide cases on the testimony. It is contended by the petitioners that the respondent makes sufficient profits on its freight hauls to enable it to operate its passenger trains with the loss incidental to said service, and that it should do so. Under the laws of this country, the Charleston & Western Carolina Railway Company is entitled to realize a reasonable profit on its investment, and under the admitted facts in the record the profits made are certainly within the limit.

The Court is of opinion, under the authorities hereinafter quoted, that to require said railway company to restore the five trains aforesaid would entail such a loss on the company as to be confiscatory of its property and take its property without due process of law.

Schedule Effective April 24, 1927, between Yemassee, S. C., and Augusta, Ga.

| No. 41 | | No. 42 |
| --- | --- | --- |
| A. M. | | P. M. |
| 8:55 | Yemassee | 5:15 |
| 9:08 | Early Branch | 5:01 |
| 9:17 | Cummings | 4:52 |
| 9:32 | Varnville | 4:38 |
| 9:37 | Hampton | 4:33 |
| 9:50 | Brunson | 4:20 |
| 9:59 | Fairfax | 4:10 |
| 10:14 | Allendale | 3:55 |
| 10:24 | Appleton | 3:46 |
| 10:33 | Beldoc | 3:36 |
| 10:41 | Martin | 3:30 |
| 10:49 | Millett | 3:23 |
| 10:59 | Hattieville | 3:12 |
| 11:08 | Robbins | 3:04 |
| 11:22 | Ellenton | 2:51 |
| 11:36 | Jackson | 2:35 |
| 12:20 | Augusta | 1:55 |

Trains 45 and 46 discontinued.

Schedule Effective April 24, 1927, between Augusta, Ga., and Spartanburg, S. C.

| No. 1 | | No. 4 |
| --- | --- | --- |
| A. M. | | P. M. |
| 10:50 | Augusta | 7:40 |
| 11:22 | Evans | 7:06 |
| 11:50 | Clarks Hill | 6:39 |
| 12:00 | Modoc | 6:29 |
| 12:08 | Parksville | 6:21 |
| 12:18 | Plum Branch | 6:11 |
| 12:29 | McCormick | 6:00 |
| 12:47 | Troy | 5:45 |
| 12:58 | Bradley | 5:35 |
| 1:08 | Verdery | 5:25 |
| 1:30 | Greenwood | 5:05 |
| 1:48 | Coronaco | 4:44 |
| 2:03 | Waterloo | 4:29 |
| 2:42 | Laurens | 4:02 |
| 3:01 | Ora | 3:40 |
| 3:08 | Lanford | 3:34 |
| 3:14 | Enoree | 3:28 |
| 3:30 | Woodruff | 3:12 |
| 3:43 | Switzer | 2:59 |
| 3:49 | Moore | 2:53 |
| 3:58 | Roebuck | 2:44 |
| 4:15 | Spartanburg | 2:30 |

Trains 1, 2 and 7 discontinued.

9 The principle was laid down in the case of *Trustees of Dartmouth College v. Woodward,* 4 Wheat., 518; 4 L. Ed., 629, that the charter of a corporation is the contract between the State and such corporation, and that case has been universally followed since. See nest of cases in Rose's Notes (Rev. Ed.), Vol. 1, p. 1005.

10 A legislative grant is a contract, within the meaning of the obligation clause of the Constitution. See cases quoted in Vol. 1, Rose's Revised Notes, p. 1006.

11 A railroad corporation is a business corporation. See cases quoted in Vol. 1, Rose's Revised Notes, p. 1011.

No principle is better settled by the highest judicial tribunal in our government than that a railroad company and no other business corporation can be .denied a judicial investigation of the question as to the confiscation of its property. *Interstate Commerce Commission v. Cincinnati, etc., Railway Company et al.,* 167 U. S., 479; 17 S. Ct., 896; 42 L. Ed., 243. *Honolulu Rapid Transit & Land Co. v. Territory of Hawaii,* 211 U. S., 291; 29 S. Ct., 55; 53 L. Ed., 188. *Louisville, etc., Railroad Co. v. Brown* (C. C.), 123 F., 948. *Western Union Telegraph Co. v. Myatt* (C. C.), 98 F., 344. *San Diego Land & Town Co. v. Jas. A. Jasper et al.,* 189 U. S., 439; 23 S. Ct., 571; 47 L. Ed., 892. *Ohio Valley Water Co. v. Ben Avon Borough,* 253 U. S., 287; 40 S. Ct., 527; 63 L. Ed., 908; 12 C. J., 1241.

The order of the Railroad Commission was simply legislative. *Lake Erie Railroad Co. v. Commission,* 249 U. S., 423; 39 S. Ct., 345; 63 L. Ed., 684. See *Prentis v. Atlantic Coast Line Railroad Co.,* 211 U. S., 210; 29 S. Ct., 67; 53 L. Ed., 150. *Ohio Valley Water Co. v. Ben Avon Borough,* 253 U. S., 287; 40 S. Ct., 527; 64 L. Ed., 908. *Glass Co. v. State,* 87 S. C., 290; 69 S. E., 391; 12 C. J., 808.

The question whether the order of the Railroad Commission is reasonable is a judicial one. See authorities, *supra.* We do not agree with the respondent that the failure of the Railroad Commission to provide in its order for an investigation by the Courts makes it void, for the Courts have that power anyway. *Ohio Valley Water Co. v. Ben Avon Borough, supra.*

The State cannot justify the confiscation of property devoted to the intrastate passenger service merely because some other branch of the company's business, State or intrastate, is reasonably profitable. *Minnesota Rate Cases,* 230 U. S., 435; 33 S. Ct., 729; 57 L. Ed., 1556; 48 L. R. A. (N. S.), 1151; Ann. Cas., 1916-A, 18. *Norfolk & Western Railway Co. v. Conley, Attorney*

*General,* 236 U. S., 605; 35 S. Ct., 437; 59 L. Ed., 745. See *Louisville & N. R. Co. v. Railroad Commission of Alabama* (D. C.), 208 F., 35. *South & North Alabama R. Co. v. Railroad Commission* (D. C.), 210 F., 465. *San Francisco Nat. Bank v. Dodge,* 197 U. S., 70; 25 S. Ct., 384; 49 L. Ed., 669. *Knott v. Chicago, B. & Q. R. Co.,* 230 U. S., 474; 33 S. Ct., 975; 57 L. Ed., 1571. It was held in *Chicago M. & St. Paul Railroad Co. v. Public Utilities Co.,* 274 U. S., 344; 47 S. Ct., 604; 71 L. Ed., 1085, that:

"A State has no power to require railroad companies to haul logs in intrastate commerce at a loss, or without compensation that is reasonable and just, even if they receive adequate revenues from the intrastate haul and the interstate haul of the resulting timber, taken together."

Also see *Brooks-Scanlon Co. v. Railroad Commission,* 251 U. S., 396; 40 S. Ct., 183; 64 L. Ed., 326. *Lake Shore, etc., M. S. R. Co. v. Smith,* 173 U. S., 684; 19 S. Ct., 565; 43 L. Ed., 858. *Missouri P. R. Co. v. Nebraska,* 217 U. S., 196; 30 S. Ct., 461; 54 L. Ed., 727; 18 Ann. Cas., 989.

The case of the *A. C. L. Railroad Co. v. North Carolina Corporation Commission,* reported in 206 U. S., 1; 27 S. Ct., 585; 51 L. Ed., 933; 11 Ann. Cas., 398, and emphasized by the petitioner, is not applicable to this case, as the service demanded was really reasonable and the cost small.

Our own cases cited by the petitioner, to wit, *Railroad Commission v. A. C. L. Railroad Co.,* 71 S. C., 130; 50 S. E., 641, and *Railroad Commission v. A. C. L. Railroad Co.,* 74 S. C., 80; 54 S. E., 224, are not in point, but the United States Supreme Court decisions, *supra,* are, and our own case, *Shealy et al., Railroad Commission of South Carolina, v. A. C. L. Railway Co.,* 131 S. C., 144; 126 S. E., 622, holds:

"Railroad Commission cannot require railroads to build connecting track, under Civ. Code 1922, § 4878, unless it is established at a hearing, at which the railroads are given

an opportunity to be heard, that the connection is necessary for the public good, and that the amount of expenditure will not be confiscatory, since otherwise the order would constitute the taking of private property without due process, in violation of" Article 14, Amendments to U. S. Constitution [*Mississippi. R. Commission v. Mobile & Ohio R. Co.,* 244 U. S., 388; 37 S. Ct.,·602] ; 61 L. Ed.,' 1216.

A railroad corporation has only restrictive power in the management of its business, affairs, and property, for the Congress of the United States and the General Assembly of the State enact laws on the subject; the Interstate Commerce Commission and the State Railroad Commission promulgate rules and regulations for its control; then its employees have their say in the premises; however, the writer has no criticism to make of this situation, but does think that such corporation should be guarded against undue encroachments without full investigation, and a clear case established showing that the same are necessary for reasonable public service, without confiscating the railroad's property.

The writer is of opinion that, for the Railroad Commission to create a zone on an interstate line passing into or through this State, and attempt by an order to restore trains on such line in that zone, that had formerly been interstate trains and removed, and thereby create the termini on that line in this State, and require such railroad to construct terminal facilities on such interstate line in such circumstances, and operate such intrastate passenger trains, although interstate passenger trains are operated over the same line of railroad would be an undue burden on interstate commerce, in violation of the laws of the United States; but it is unnecessary to base the opinion in this case on that theory.

After a full consideration of the issues involved in this case, and the testimony offered for and against, the Court is of the opinion that the mandamus should be denied, and the petition dismissed; and it is ordered accordingly.

MESSRS. JUSTICES COTHRAN, BLEASE, and STABLER concur.

MR. CHIEF JUSTICE WATTS did not participate.

MR. JUSTICE CARTER (dissenting): Being unable to agree to the conclusion reached in the leading opinion in this case, I most respectfully dissent, and shall, in a brief way, state my reasons therefor.

While the transcript of record does not disclose proof to support the allegations of the petition as to the inadequacy of train service between Spartanburg, S. C., and Woodlawn, S. C., under the view I take of the testimony, a statement and review of which will serve no useful purpose, there is ample proof to support the allegation of inadequate service between Yemassee and Beach Island, S. C. At the last reference in the case, the respondent offered testimony tending to show that the perishable property in less than carload lots, which was formerly handled by express on the passenger trains discontinued by the respondent, was at the time of that reference being transported by means of motor trucks, and it is contended by the respondent that the former train service is, therefore, not needed. The very fact that it is necessary to use motor trucks for the transportation of the perishable property formerly transported on the trains which the respondent discontinued is some proof that the respondent is not furnishing adequate service on this line, Yemassee to Beach Island. Moreover, there are those who have perishable property to be transported to the market who cannot afford motor trucks. In my opinion, the petition should not be dismissed as to this line. Since the Court has the power to grant such relief as is just and equitable, and the facts in the case warrant, I think that the respondent should be required to furnish better train service on this line, Yemassee to Beach Island, for the speedy handling of perishable products in less than carload lots.

But, in view of the fact that the record clearly discloses that the respondent has been operating its passenger trains

at a loss, in my opinion, the respondent should be granted the option of supplying the needed service by the use of a motor train, in use by other railroads, which could likely be operated at a moderate cost, and thus avoid the heavy loss heretofore experienced in operating the regular passenger trains, which were discontinued, and thereby care for the public interest without detriment to the respondent.