19154

CAROLINA PIPELINE COMPANY, Respondent, v. The SOUTH CAROLINA PUBLIC SERVICE COMMISSION, Guy Butler, Chairman, Clyde F. Boland, A. D. Amick, Fred A. Fuller, Jr., J. Lewis Moss, John J. Snow, and Edward Wimberly, Commissioners, The South Carolina Electric & Gas Company, The City of Georgetown, and The County of Georgetown, Appellants.

(178 S. E. (2d) 669)

Messrs. *William F. Austin, Harold W. Jacobs, George H. Fischer,* and *Edward W. Mullins,* of Columbia, *Patrick J. Doyle, Sylvan Rosen,* and *C. Claymon Grimes, Jr.,* of Georgetown, *Rembert C. Dennis,* of Moncks Corner, and *John A. Martin,* of Winnsboro, *for Appellants,*

*Messrs. Howard L. Burns,* of Greenwood, *John M. Spratt,* of York, *Rex L. Carter,* of Greenville, *Harry M. Lightsey, Jr., Ralph C. Robinson, Jr.,* and *Watts Stroman,* of Columbia, *for Respondent,*

*Messrs. William F. Austin, Harold W. Jacobs, George H. Fischer,* and *Edward W. Mullins,* of Columbia, *Patrick J. Doyle, Sylvan Rosen,* and *C. Claymon Grimes, Jr.,* of Georgetown, *Rembert C. Dennis,* of Moncks Corner, and *John A. Martin,* of Winnsboro, *for Appellants in Reply*

January 14, 1971.

BRAILSFORD, Justice.

This is an appeal from an order of the circuit court reversing an order of The South Carolina Public Service Commission, which granted to South Carolina Electric & Gas Company a certificate of public convenience and necessity to supply natural gas throughout Georgetown County and, to that extent, revoked a certificate granted to Carolina Pipeline Company by an order of the Commission dated April 9, 1958, as modified by order dated August 5, 1959.

The 1958 order, construed in the light of the petition on which it was based, contemplated the reasonably prompt extension of Carolina's existing natural gas lines to Georgetown via Timmonsville, Lake City and Kingstree, and, further, authorized service to additional municipalities, including Myrtle Beach and Conway, and surrounding territories when financially feasible. The 1959 modification of this order, preserving Carolina's right to develop the territory certificated by it when economically feasible, granted to Carolina a certificate of public convenience and necessity to extend its natural gas transmission line from a point north of Florence to Marion, thence to Conway, Myrtle Beach and on to Georgetown, in order to serve "distribution systems which it proposes to construct and operate in and around" these municipalities.

In 1966, Carolina extended its natural gas distribution system to Myrtle Beach, some thirty-five miles northeast of the City of Georgetown, and to an industrial consumer at Johnsonville, some thirty-nine miles to the northwest. However, it has never extended natural gas service to any part of Georgetown County, because, according to its management, it has not been economically feasible to do so without one or more large industrial consumers contracting for service.

The present controversy arose in 1969 when Carolina was introduced to Midland Ross Company of Toledo, Ohio, which was interested in locating an industry in Georgetown requiring a large volume of natural gas in its manufacturing process, and failed to offer service on terms acceptable to the industry. Midland had perfected a process for reducing iron ore to iron pellets, which, in turn, could replace scrap iron in the manufacture of steel. Recently established Georgetown Steel Company, desiring to expand its production beyond the volume which available scrap would support, had sought out Midland and interested it in establishing a Georgetown plant. If Midland's requirements for a plant site could be met, plans developed by the two companies called for the expenditure of $40,000,000.00 in plant construction and expansion, which would immediately result in a large increase in Georgetown's industrial payroll, with further expansion contemplated. The combined operations of the two companies were expected to triple the tonnage handled through the port and to justify deepening the channel to accommodate large tankers bringing in iron ore mixed with water, which was one of Midland's prime site requirements.

The other prime requirement was a dependable supply of natural gas in tremendous volume at low cost. Since the cost of natural gas used in Midland's manufacturing process would amount to forty to fifty percent of the total cost of the product, the importance of this factor is apparent. Because of the cost factor, Midland was only interested in con-

tracting for interruptible gas, which is less expensive than firm gas. Yet no substitution of fuels in the manufacturing process is possible, and successful operation of an iron pellet plant requires a supplier capable of furnishing large quantities of interruptible gas with minimum disruption of service. Unless this requirement could be met at Georgetown, Midland would locate its plant elsewhere and ship iron pellets to Georgetown Steel by barge.

Mr. Wolfgang Jansen, President of Georgetown Steel, and officials of the City and County of Georgetown, understandably, were anxious to meet Midland's natural gas needs so that the plant would be constructed as proposed. Mr. James B. Moore, Georgetown attorney and member of the South Carolina Ports Authority, was keenly interested and played a leading role. These parties first turned to Mr. John A. Warren, president of Carolina, and a meeting between him and representatives of Midland was held in Georgetown on May 30, 1969. Mr. Moore and Mr. Jansen attended the meeting. The results were discouraging. Mr. Warren stated that Midland could expect service under an interruptible contract only seventy percent of the time. This was unsatisfactory to the industry which required (and, based upon its experience, considered normal) eighty-five to ninety percent availability. The rates which he quoted for firm gas and for various combinations of firm and interruptible gas (proposed to increase availability) were not acceptable to the industry. Ensuing negotiations culminated in a meeting on August 4, between Mr. Warren and Mr. Hamilton McVey, area manager of the responsible division of Midland, who was authorized to contract for the corporation. This meeting was also attended by Mr. Jansen, Mr. Moore and a number of other interested officials and citizens. After protracted discussions, which continued into the evening with a smaller group present, Mr. Warren and Mr. McVey were unable to agree upon terms or upon a basis for further negotiations. Mr. Warren stated that "he had put forward the best proposal that he possibly had." And Mr.

McVey stated that "(o)n these terms * * * there would be no contract."

In the meantime, after the discouraging meeting of May 30, Mr. Jansen had contacted Mr. Allan C. Mustard of South Carolina Electric & Gas to determine whether an alternative supply of gas was available. Mr. Mustard refused to discuss the matter with him. At about the same time, Mr. Mustard was contacted by a consulting engineer who had been hired by the City of Georgetown to help resolve Midland's gas problems. Mr. Mustard again refused to discuss the matter, saying that those interested first would have to try to work out a contract with Carolina, but indicated that he would be prepared to talk if these efforts failed.

On the evening of August 4, after negotiations between Mr. Warren and Mr. McVey had broken down, Mr. Moore told Mr. Warren that he was not going to see Georgetown lose the industry without a fight—that he was going to contact South Carolina Electric & Gas—and asked Mr. Warren if he would give up the territory. Mr. Warren replied that he would not, but he made no further effort to reconcile his differences with Mr. McVey and has not attempted to resume negotiations with Midland.

Mr. Moore arranged to bring Mr. McVey and Mr. Mustard together in Columbia on the next day, and they quickly agreed upon mutually satisfactory terms on which South Carolina Electric & Gas would furnish natural gas to Midland, provided the Commission would grant the necessary certificate.

On August 12, 1969, South Carolina Electric & Gas petitioned the Commission for a certificate of public convenience and necessity to furnish natural gas service to Georgetown County. It proposed to extend an existing sixteen inch line from a point at Ladson in Charleston County to Georgetown, to build distribution systems and to promptly furnish natural gas to consumers in Georgetown and Andrews and to fulfill the request of Georgetown Steel and Midland for such service.

A protest was filed by Carolina, which was joined by the Town of Hemingway, and the City and County of Georgetown filed petitions in support of the request of South Carolina Electric & Gas. Extensive hearings were held commencing September 15, 1969. While Carolina's protest alleged that it was ready, willing and able to serve Midland and Georgetown County with natural gas, its officers testified that it could not do so without an industrial contract, which it had no prospect of securing. On November 12, 1969, the Commission issued its order granting the petition of South Carolina Electric & Gas and setting aside so much of its earlier orders as had certificated any part of Georgetown County to Carolina.

On Carolina's appeal to the circuit court, as authorized by Section 58-124, Code of 1962, the order of the Commission was reversed and the case remanded for dismissal of the petition. This code section provides that decisions of the Commission may be reviewed by the court "upon questions of both law and fact." The circuit judge gave a broad construction to this section, apparently concluding that it authorized the substitution of his judgment for that of the Commission as to the wisdom of the action taken. This conclusion is opposed by the opinion of this court in *Board of Bank Control v. Thomason,* 236 S. C. 158, 113 S. E. (2d) 544 (1960), construing a similar statute, and by the authorities therein cited. Even if under *Ohio Valley Water Co. v. Ben Avon Borough,* 253 U. S. 287, 40 S. Ct. 527, 64 L. Ed. 908 (1920), and *Blease v. Charleston & W. C. Ry.,* 146 S. C. 496, 144 S. E. 233 (1928), Carolina was entitled to independent judicial review of issues of confiscation and due process, as urged in the brief, this is not synonymous with substitution of judgment. However, under our view of the case, the scope of review is not controlling, and it is unnecessary to explore the question.

After emphasizing the importance of territorial integrity in utility regulation, the circuit court found (1) that Carolina, relying upon prior orders of the Commission, had over-

sized certain of its lines and made investments so as to have the capacity to serve Georgetown, and adjacent areas, when it became feasible to do so; (2) that it has not been practical to render service "prior to the location of the industry involved in this case"; (3) there has been no abandonment of the territory by Carolina; (4) "(t)hat either utility has the capacity and the ability to serve the new industry proposing to locate in Georgetown." The court concluded "(t)hat the Public Service Commission erred, therefore, in granting to another utility the right to serve in territory previously granted to (Carolina)."

But the Commission did not have the opportunity to choose between two utilities, either of which was capable of providing service to Georgetown and to one of which the territory had been certificated. The case before it, on virtually undisputed facts, was natural gas service and important industrial expansion for Georgetown County if authorization to serve should be granted to South Carolina Electric & Gas; or, no gas for the foreseeable future and no industrial expansion if such authorization should be denied.

Not only was Carolina unwilling to serve the potential industry on acceptable terms, it lacked the capability for meeting the industry's requirements for interruptible gas service. The reasons for this are well stated in appellants' brief, with full support in the record, as follows:

"A natural gas utility sells gas to customers on either a 'firm' or an 'interruptible' basis. It backs up its commitments to its firm customers by a contract with its supplier for a guaranteed delivery of enough gas to meet their combined maximum needs. Price of this gas is higher than gas sold on an interruptible basis. Interruptible customers, generally large industrial users, are supplied gas either from firm gas commitments not used by firm customers, known as 'valley gas' or from excess available from the suppliers, known as 'overrun' (ff. 298-300). If such excess gas is not available, usually in cold weather, the interruptible customer's service

is cut off. The dependability of interruptible service from a utility is dependent to a large extent on the size of its firm gas commitment as compared to the total amount of gas sold, *i. e.,* on a firm and an interruptible basis. This is known as 'load factor'. The lower the load factor, generally the more dependable the interruptible service. South Carolina Electric & Gas Company's load factor was 127%. Carolina Pipeline's load factor was 272%. Dependability of interruptible service is also affected by the size of the contract demand. The larger the contract demand, the greater volume of overrun capacity that is made available to the utility by the supplier. South Carolina Electric & Gas Company has a natural gas contract demand for 145,000 m.c.f. per day. Carolina Pipeline has a natural gas contract demand for 25,800 m.c.f. per day. The combined effect of the higher load factor and the relatively small contract demand of Carolina Pipeline resulted in the industry questioning its capability to deliver reliable interruptible service to it (ff. 281-287)."

Mr. McVey testified that he could not contract with Carolina for Midland, even if terms could then be agreed upon, because, on the information at hand, he doubted its capability for furnishing interruptible natural gas service meeting the needs of the industry. On the other hand, he testified:

"Q. If you are permitted to negotiate, or attempt to negotiate a contract with the South Carolina Electric and Gas Company, what would be your decision so far as the location of this plant in Georgetown is concerned?

"A. Based on the technical information I have received today, and my interpretation of it, and based on the terms that I have discussed with Mr. Mustard, I would say I could reach . a satisfactory contract with them for supplying this gas.

"Q. And you are authorized to make this decision for Midlands-Ross?

"A. Yes, I am."

In addition to what Mr. McVey referred to as technical information engendering doubt as to Carolina's capability,

Mr. Warren's statements in the course of negotiations about interruptible gas and its availability virtually eliminated Carolina as an acceptable supplier of this type of service. He not only warned that service could be expected only seventy percent of the time, but stated that an industry at Georgetown, being at the end of the line, would be the first to be cut off in time of shortage and the last to be restored as the supply of gas became more abundant.

The court's key finding that Carolina "has the capacity and the ability to serve the new industry proposing to locate in Georgetown" is without support in the evidence if it refers to the furnishing of satisfactory interruptible natural gas service. If it does not, it is wholly irrelevant to the issue before the Commission.

The Commission found, and Carolina admits, that it is not economically feasible for it to serve Georgetown without a contract with a large industrial consumer. The Commission found on undisputed evidence that Carolina had failed in its efforts to negotiate a contract with Midland, and it is admitted that Carolina has no other prospect for such a contract. Hence, the effect of the court's judgment is to deny presently available natural gas service to Georgetown, and with it the opportunity to gain significant industrial expansion, in order to preserve Carolina's previously acquired right to serve the area when, perchance, it should be become economically feasible for it to provide service. This simply sacrifices the public interest in order to preserve the integrity of a certificate improvidently (in the light of hindsight) issued to Carolina some ten years earlier, and was error under any view of the rights acquired by a South Carolina utility under a certificate of public convenience and necessity. The Commission was authorized by Section 58-122 Code of 1962, which is constructively a part of its orders, upon notice and opportunity to Carolina to be heard, to rescind, alter or amend the 1958 and 1959 certificates issued to Carolina. The virtually undisputed facts which

have been stated required that it exercise this authority in the public interest.

The suggestion that Carolina has not been given an opportunity to serve until its differences with Midland have been submitted to the Commission for adjustment is unrealistic. This was not a dispute between a consumer and a utility which could be settled by that body. Carolina was given the opportunity to satisfy the industry's gas requirements and failed. In its search for an industrial site, Midland was not subject to the orders of the Commission. No effort has been made to show that its demands were unreasonable, and nothing in the record impeaches its good faith in negotiating with Carolina. Mr. McVey testified that he did not know South Carolina Electric & Gas as a possible supplier until after negotiations with Mr. Warren had terminated.

We find no merit in Carolina's claim that to modify the 1958 and 1959 orders by eliminating Georgetown from its certificated territory amounts to a confiscation of its property without due process of law, nor did the circuit court so find. The claim is that in designing and extending its gas distribution system, Carolina oversized certain pipe and made other investments so that it would have the capacity to serve Georgetown when this became feasible. No doubt some of this was done with an eye to future expansion in Georgetown and elsewhere in its undeveloped territory. However, having accepted and acted upon the certificate subject to the Commission's statutory power to rescind or modify it, Carolina must be held to have assented to this reservation, at least for good cause shown. Cf. 36 Am. Jur. (2d), Franchises, Sec. 52 (1968), and cases cited in footnotes.

Furthermore, Carolina's factual showing that it will be deprived of the effective use of any of its plant because of the elimination of Georgetown from its service area is weak. The stubbed out eight inch line at Johnsonville, several times

oversized for intended use at Georgetown according to Carolina, is apparently a six mile branch, installed to serve an industry at Johnsonville, from its main transmission line from Marion to Conway and Myrtle Beach. Although Carolina characterizes this line as poised for extension of service to Georgetown, with nowhere else to go, it is undisputed that an expenditure of $1,700,000.00 to improve Carolina's upstream facilities would be required to provide effective service to Georgetown via this route. Furthermore, this route to Georgetown has never been certificated by the Commission. The approved route to Georgetown under the 1958 certificate was via Timmonsville, Lake City and Kingstree, and it was via Marion, Conway and Myrtle Beach under the 1959 modification of the original certificate.

Finally on this point there is no evidence that the Commission's action rendered any of Carolina's plant worthless, or, if impaired, the extent of such impairment.

The order appealed from is reversed and that of The South Carolina Public Service Commission is reinstated.

Moss, C. J., and LEWIS, BUSSEY and LITTLEJOHN, JJ., concur.