192 Va. 828 (1951)
CITY OF NORFOLK AND DR. L. RAY TEMPLE
v.
THE CHESAPEAKE AND OHIO RAILWAY COMPANY.
Record No. 3850.
Supreme Court of Virginia.
October 8, 1951.
for the appellants.
Present, All the Justices.
1. The State Corporation Commission granted appellee railroad company authority to suspend the operation of transfer service by ferryboat for passengers between Newport News, Norfolk and Portsmouth and to provide in lieu thereof transfer service by motor bus. Appellee's railroad tracks ran to the city of Newport News and from there it operated the ferryboat transfer service to and from Norfolk and Portsmouth. The evidence disclosed that the transfer service by boat was conducted at a great loss to appellee and that substantial savings could be effected by changing to the bus service. One of appellants, a resident of Norfolk, and the witnesses appearing in his behalf, testified to their desired use of the ferryboat service, and stated for reasons that the ferryboats were more comfortable, more roomy, and provided lavatory facilities. Those reasons were in the nature of personal pleas upon their preference of travel by ferryboat to travel by bus and that evidence did not present a public need for the ferryboat transfer service for local passengers.
2. Under the facts of headnote 1, the Commission first granted temporary authority to change the service, and then after hearing all the evidence, entered an order granting permanent authority. Appellants contended that the Commission erred in granting the temporary authority after only an ex parte hearing, since the temporary order had the effect of shifting the burden of proof from appellee to appellants. There was no merit in that contention since appellee was required to present at the public hearings evidence upon which the Commission would be justified in ordering the change in service and the public hearings were advertised as required by law, and the users of the ferryboat service had actual notice of the suspension of service while the boats were not being operated under the temporary order of suspension. Had there been any consequential objection to the abandonment of the ferryboat service, it is most natural that it would have been voiced upon the actual, although temporary, abandonment thereof.
3. Under the facts of headnote 1, appellants contended that the Commission erred in refusing a request to take the depositions of appellee's superintendent, and that the Commission erred in refusing to allow the issuance of a subpoena duces tecum upon it being requested to issue the same against appellee's vice-president. Both the superintendent and the vice-president were present at the hearings and they had with them all necessary data and both were subjected to cross-examination by appellants' attorneys. Appellants' contentions were without merit since the rulings were within the sound discretion of the Commission, and the appearance of the two witnesses at the hearing reduced the assignments of error to moot questions.
4. Under the facts of headnote 1, appellants contended that the Commission erred in refusing them the privilege of adducing evidence as to the profit or loss resulting from appellee's operation in and out of Newport News, Norfolk and Portsmouth, as compared with other sections of the state and, likewise, the portion of the loss resulting from passenger traffic assigned to the Newport News, Norfolk and Portsmouth area as compared to the loss attributable to appellee's passenger operations along other portions of its line in Virginia. That contention was without merit since it was disclosed that appellee's records would not disclose the information requested. Appellee stipulated that its freight business had been profitable in recent years in that general section and that stipulation covered all that appellants could expect to prove.
5. Under the facts of headnote 1, appellants contended that the Commission erred in not sustaining their motion to dismiss appellee's petition and based their reasoning for the motion upon the ground that the Act of 1894 which granted the appellee the right to come into the city of Norfolk limited such right to the use of boats, steamers and other vessels and by reason of said restrictions prohibited the use of any other instrument, including buses. That contention was without merit because railroads are free to choose their own methods and agencies for performing services for which they are responsible; and because the Corporation Commission is empowered under the Constitution of Virginia to order the changes in the transfer service that were made. The Act of 1894 of necessity yielded to the Constitution of Virginia.
6. Under the facts of headnote 1, appellants contended that the Commission erred in entering its final and permanent order permitting appellee to discontinue the ferryboat service. That contention was without merit since the order did not authorize appellee to abandon its service, but simply substituted one service for another, and the evidence disclosed that the public did not need, use or avail itself of the ferryboat service. The evidence amply supported the finding of the Commission that the substituted motor bus service met the public convenience and necessity in the area, and the order, in view of the evidence, was just and fair.
Appeal from an order of the State Corporation Commission. The opinion states the case.
Jonathan W. Old., Jr., Leighton P. Roper and Jett, Sykes & Howell,
Horace L. Walker and Hewitt Biaett, for the appellee.
EGGLESTON
Eggleston, J., concurring.
Section 156(b) of the Constitution gives the State Corporation Commission broad powers and duties in the supervision, regulation and control of transportation companies doing business in this State. Under its provisions the Commission "shall require them to establish and maintain all such public service facilities and conveniences as may be reasonable and just." We have said that under this provision the Commission may authorize the discontinuance or elimination of facilities which are unreasonable and unjust to a carrier. See
Portsmouth Virginia Ry., etc., Co., 141 Va. 44, 126 S.E. 366; Hampton Newport News & Hampton Ry., etc., Co., 144 Va. 29, 131 S.E. 328;
Lynchburg Traffic Bureau Commonwealth, 189 Va. 612, 54 S.E.(2d) 66.
I agree that under the authority vested in it by this section of the Constitution the Commission was empowered to authorize the Chesapeake and Ohio Railway Company to suspend the service of transferring passengers by ferry steamers between Newport News, Norfolk and Portsmouth, and in lieu thereof to enter into a contract with the Richmond-Greyhound Lines, Inc., for the carriage of such passengers by motorbuses between these points, upon a showing by competent evidence that the change in the facilities furnished would be reasonable and just to both the carrier and the public.
On October 15, 1947, the Commission, after a hearing, entered an order permitting the Norfolk Southern Railway Company to discontinue its carriage of passengers by rail between Norfolk and Virginia Beach. (See S.C.C. Case No. 8956.) Similarly, by order entered on January 20, 1948, the same railway company was authorized to discontinue its passenger service by *843 rail on its other lines operating in this State. (See S.C.C. Case No. 9072.) In both instances the railway company was permitted to retain the transportation of freight by rail, while arrangements were made for carrying passengers by motorbus.
Although the city of Norfolk filed a formal protest against the suspension of the operation of the ferry service, and had a legal representative present at the hearings, it offered no evidence in support of its position. The city manager of Portsmouth notified the Commission, by telephone, that its "position would be the same as the city of Norfolk," but offered no evidence at the hearings.
While representatives of the Norfolk Association of Commerce, the Hampton Roads Maritime Association, and the Division of Ports, State Conservation and Development Commission, were present at one of the hearings, none of them offered any evidence for or against the proposed change.
The Portsmouth Chamber of Commerce, through its board of directors, notified the Commission that it approved the change.
The city attorney of Newport News attended one of the hearings as an "observer," but took no part in the proceedings.
The Railway Company presented evidence which clearly showed that the steamer service was operated at a considerable loss, that it was little patronized by local passengers, that it was not reasonably necessary to the economic life of the community, and that the substitute motorbus service was fully adequate for the public needs.
The active objectors introduced five witnesses who testified that they had been frequent users of the steamer service in the past and found the substituted service and other facilities available for transportation between the cities burdensome, uncomfortable and inadequate. They also offered other witnesses who testified that ferry service other than that which the Railway Company had maintained could be rendered at less cost.
Upon the evidence adduced before it the Commission found that the Railway Company had suffered a heavy loss, with no prospect of improvement, in the operation of the steamer service; that the substituted motorbus service could be operated at substantially less cost; that while the change might cause some inconvenience to local passengers, such passengers are not dependent upon the service, but "have other adequate means of *844 transportation;" and that the substituted service would be reasonable and adequate for the public needs.
It is the function of the Commission to settle the conflicts in the evidence. Moreover, its action comes to us as being "prima facie just, reasonable and correct." Constitution, | 156(f). I agree that the evidence fully sustains its findings, and that the order appealed from should be affirmed.
WHITTLE
WHITTLE, J., delivered the opinion of the court.
This is an appeal of right taken by the city of Norfolk, Virginia and Dr. L. Ray Temple from an order of the State Corporation Commission of Virginia, which grants the Chesapeake and Ohio Railway Company authority to suspend the operation of transfer service by ferryboat for passengers between Newport News, Norfolk and Portsmouth, Virginia, and to provide in lieu thereof transfer service by motor bus for passengers using its trains into and out of Newport News.
On May 24, 1950 appellee filed its petition stating that passenger service over the route had substantially decreased, that the transfer service by ferryboat was not efficient and economical and that substantial losses had been incurred, placing an undue burden upon appellee, that reasonable and adequate transfer service by motor bus for passengers could be provided under an arrangement with Richmond-Greyhound Lines, Inc., a Virginia corporation holding a certificate of public convenience and necessity as a common carrier of passengers between the points involved.
It was alleged by appellee that the change in transfer service from ferryboat to bus would enable it to make a saving in direct operating expenses of approximately $200,000 per year.
At the request of appellee the commission entered an order on May 25, 1950 based upon facts alleged in the petition and the facts and circumstances before it, authorizing appellee to suspend temporarily the operation by ferryboat and in lieu thereof to provide the service by motor bus in the manner outlined for a period of ninety days from June 5, 1950. The order also provided that appellee could suspend the ferryboat service permanently after the expiration of ninety days and in lieu thereof provide such service by motor bus, unless the commission determined within the period that the suspension should not be made permanent and, by further order, the permanent suspension stayed. *831 
On June 8, 1950, the commission entered a further order in response to a petition filed by Dr. L. Ray Temple of Norfolk, permitting him to intervene in the proceeding, and the case was set for public hearing before the commission on July 27, 1950. At this hearing appellee was required to produce such testimony and evidence as it deemed necessary to justify the permanent substitution of motor bus transfer service in lieu of the ferryboat service theretofore performed.
After the publication and posting of notices as prescribed by law the hearing was held on July 27, 1950, at which time appellant, city of Norfolk, was permitted to intervene in the case. The hearing was not concluded at that time and a further hearing was had on October 19, 1950 at which time the evidence was concluded.
Pending the decision of the case the temporary substitute transfer service by motor bus was continued.
Briefs and reply briefs were filed with the commission by both appellants and appellee and on December 13, 1950, the commission unanimously entered a final order granting a continuance of the substitute service, which is the order here complained of.
The evidence on behalf of appellee developed at the public hearings in this matter shows that its railroad tracks run to the city of Newport News, they do not run across Hampton Roads to Norfolk and Portsmouth. In order to provide service to these two cities appellee operated a ferryboat transfer service for passengers and baggage to and from these points. This service handled both local passengers and passengers using the main line trains of appellee into and out of Newport News.
Prior to the order this transfer service was maintained by the use of two ferryboats, the "Virginia" and "Wauketa", built in 1902 and 1908, respectively. Each boat had a carrying capacity in excess of 800 passengers.
Since the entry of the temporary order on May 25, 1950 appellee, in compliance with the order, has used modern motor buses in this transfer service. This bus service is operated under a contract between appellee and the Richmond-Greyhound Lines, Inc. These buses operate between the passenger stations of appellee in Newport News, Norfolk and Portsmouth and make the same train connections as made by the boats.
The record shows and the commission found as a fact that *832 appellee's passenger traffic in this territory and over its system as a whole had rapidly declined and at the same time operating expenses had rapidly increased.
In 1945 the over-all passenger deficit of appellee was $3,250,000, and it progressively increased until it exceeded $20,000,000 in 1949.
In Virginia the record shows that appellee's passenger losses were as follows: In 1947 $4,561,358; in 1948 $5,661,704; in 1949 $4,537,339, and revenue passenger miles handled on appellee's road in Virginia decreased from 500,000,000 in 1944 to less than 100,000,000 in 1949.
While the financial loss to the company is not the controlling factor in a case of this kind, the table of figures set out below has a direct bearing upon the use of the service by the public and clearly indicates that the public is not using the ferryboat transfer service to any appreciable extent.
It is disclosed that the operation of transfer service by boat between Newport News, Norfolk and Portsmouth has been conducted at a great loss to appellee. Exhibit 23 filed by appellee shows the following: TABLE OMITTED
The commission finds as a fact that substantial savings can be effected by changing the ferryboat transfer service to the bus service. Appellee produced evidence to show that the minimum direct operating expense for the ferry service would be $385,542 per year while the service by motor bus can be furnished under its contract with the Greyhound company for a total of $149,107 per year, resulting in a net annual saving to appellee of $236,435.
Appellee introduced the contract with the Greyhound company dated May 23, 1950, dealing with the substitute transfer service. This contract provides that Greyhound shall furnish, subject to appellee's direction, as many as twelve buses for use in this service. Each of these buses has a seating capacity for 37 passengers, and has three baggage compartments for 86 pieces of normal-size baggage. The buses are described as being the most modern coaches manufactured today, having deluxe seats and are air conditioned and comfortable. Norfolk is a division *833 point for the company where a large number of buses are maintained and ample buses are available to comply with the contract.
 Dr. L. Ray Temple, one of the appellants, and the witnesses appearing before the commission in his behalf failed to present a public need for the ferryboat transfer service for local passengers. One Norfolk resident desired to use the transfer service by ferryboat six days a week between Norfolk and Newport News; another resident of that city desired to use the service for one round trip between Norfolk and Newport News on week-ends; another Norfolk resident desired to use the service by ferryboat for one round trip to Newport News one day a week and for a round trip to Richmond on some week-ends; another Norfolk resident desired to use the transfer service by ferryboat from time to time from Portsmouth to Newport News and from Portsmouth to Williamsburg, and a Portsmouth resident desired to use the service by ferryboat from time to time for round trips to Williamsburg.
These five witnesses testified to their desired use of appellee's ferryboat transfer service and only four of them claimed to desire the service between Norfolk and Newport News. The reasons given by these witnesses for the desired use of this service were in the nature of personal pleas based upon their preference of travel by ferryboat to travel by bus, largely on the ground that the ferryboats were more comfortable, more roomy, and provided lavatory facilities. This evidence does not make out a case of either public or private necessity.
An official of the Norfolk Advertising Board appeared before the commission and stated that his board protested the change of service. He estimated that there were 6,175,000 daylight visitors and 1,307,200 overnight visitors to the Norfolk area in 1949. He could not tell how many of these people used the ferryboat service but said his board was afraid the change would affect the travel into the area.
The foregoing is the substance of the evidence introduced by appellants to show the public need for ferryboat service by either local or train passengers.
Appellants next attempt to show by several witnesses that appellee does not operate the ferryboat transfer service economically and that the same can be economically operated. One witness suggests that the ferryboat "Wauketa" could be *834 powered by a diesel engine and that the change would save money. He admitted, however, that he was not a diesel engineer.
Another witness suggests that appellee's ferryboats were not economical and that their size far exceeded the requirements. He suggests the abandonment of the ferryboats and a substitution therefor of an L.C.I. type ship which could be rebuilt and operated for $156,973.20 per year. This witness admits that his cost estimates are not on a basis recognized by either the Interstate Commerce Commission or the Corporation Commission of Virginia.
The final witness introduced by appellants is an official of a Norfolk steamship brokerage business. His company is capitalized at $100,000 with only $20,000 paid in. This witness on behalf of his company desired to enter into a contract with appellee to convert an L.C.I. type vessel for use in the ferry operation for an annual charge of $200,000 per year. His offer did not include ticket agents or dock workers, neither did it include railway labor necessary for docking, unloading or loading the boats.
The foregoing is all the evidence in opposition to the substitute transfer service from ferryboats to buses. The city of Norfolk offered no evidence on its part. It specifically adopted the evidence introduced by Dr. Temple.
The three major cities affected by this change are Norfolk, Portsmouth and Newport News. Norfolk is the only city officially entering a protest. Newport News remains silent while in Portsmouth the City Manager protests the change in a telephone message to the commission; however, the Chamber of Commerce of Portsmouth, through its board of directors, in a letter to the Corporation Commission recommends the change from ferryboats to buses.
Appellants rely upon six assignments of error. Assignment No. 1 is as follows:
"The Commission erred in entering its order dated May 25, 1950, after only an ex parte hearing, which order allowed the C&O to temporarily suspend operation of its line of railroad between Norfolk, Portsmouth and Newport News, Virginia, by ferryboat."
 It is contended that the temporary order of May 25, 1950 had the effect of shifting the burden of proof from appellee to appellants. There is no merit in this contention. Appellee was *835 required to present at the public hearings evidence upon which the Corporation Commission would be justified in ordering the change in service. The public hearings were advertised as required by law, the general public had notice of them through the advertisements, and certainly the users of the ferryboat service had actual notice of the suspension of service while the boats were not being operated under the temporary order of suspension. Had there been any consequential objection to the abandonment of the ferryboat service, it is most natural that it would have been voiced upon this actual, although temporary, abandonment thereof. If any hardship to the public from the change was likely to develop surely it would have developed while the temporary order was in effect.
Assignments of error Nos. 2 and 3 can be treated together. They read:
"(2) The commission erred in refusing the appellant Temple's application to take the deposition of I. D. Irwin, Superintendent and General Manager (Chesapeake District) of the C&O, pursuant to the provision of Rule 9 of the Rules of Practice and Procedure of the Commission."
"(3) The commission erred in refusing to allow the issuance of a subpoena duces tecum requested by the appellant, Temple, said subpoena being requested to issue against C. A. Taylor, Vice-President and General Manager of the C&O."
 The rulings here were within the sound discretion of the commission. Both Mr. Taylor and Mr. Irwin were present at the hearings. They had with them all necessary data and both were subjected to cross-examination by Dr. Temple's attorneys. The appearance of these witnesses at the hearing reduces these assignments of error to moot questions. They were not stressed in oral argument and are without merit.
Assignment No. 4 is as follows:
"(4) The Commission erred in refusing the appellants herein the privilege of adducing evidence as to the profit or loss resulting from the C&O's freight operation in and out of Newport News, Norfolk and Portsmouth, Virginia, as compared with other sections of the state and, likewise, the portion of the loss resulting from passenger traffic assigned to the Newport News, Norfolk and Portsmouth area as compared to the loss attributable to the C&O's passenger operations along other portions of its line in Virginia." *836 
 It was explained fully that the information here sought to be obtained was not available and could not be made available. The commission, in denying the request, stated that appellee's records would not disclose the information requested, that the records were not kept in this manner but were kept in accordance with its rules and the rules of the Interstate Commerce Commission. However, appellee stipulated that its freight business had been profitable in recent years in Virginia and in the Tidewater section of the State. This stipulation covered all that appellants could expect to prove, and there is no merit in this assignment of error. This court has repeatedly held that the Corporation Commission may authorize either the elimination or modification of particular facilities although the operation of the company as a whole is shown to be profitable. Lynchburg Traffic Bureau Commonwealth, 189 Va. 612, 54 S.E.(2d) 66; Atlantic Coast Line Ry. Co. Commonwealth, 191 Va. 241, 61 S.E.(2d) 5, and Fleming Commonwealth, 191 Va. 288, 61 S.E.(2d) 1. Other States hold the same. See Blease Charleston, etc., Ry. Co., 146 S.C. 496, 144 S.E. 233; Chicago, etc., R. Co. Municipalities of Holdrege,
152 Neb. 352, 41 N.W.(2d) 157, 161.
The fifth assignment of error is as follows:
"(5) The Commission erred in not sustaining appellants' motion to dismiss the petition of the C&O."
Appellant, Dr. Temple, filed a written motion to dismiss this proceeding, basing his reason for the motion upon the ground that the Act of 1894 which grants appellee the right to come into the city of Norfolk limits such right to "the use of boats, steamers and other vessels or partly by such and partly by rail * * * and by reason of said restrictions prohibited the use of any other instrument, including buses."
This Act was passed in 1894 before the day of motor bus transportation and good roads. Under the Act appellee could have entered the city of Norfolk by rail. If it had done so, in view of our former decisions, it could hardly be argued that if the rail method of transportation had proven burdensome the commission could not grant relief by permitting abandonment of the railroad and resort to motor bus. Section 56-111 of the Virginia Code authorizes railroad or steamboat companies to acquire, own and operate motor vehicles or aircraft for transportation purposes as therein defined. In this case appellee has provided transfer service by motor bus under its contract with *837 Richmond-Greyhound Lines, Inc. This bus company holds certificates of public convenience and necessity authorizing it to operate between the points here in question. Both appellee and the Greyhound company are regulated and controlled by the Corporation Commission which assures protection to the public.
As stated in the opinion of the commission, there is nothing unusual in this type of substitute service by motor bus which appellee is required to maintain. The opinion recites: "The service which the railway company proposes to furnish in lieu of the steamboat ferry is not unlike the service the Baltimore and Ohio Railroad Company has furnished for years for its passengers to and from New York. That railroad operates busses between points in New York City and its Jersey City terminals, which is a very heavily congested area."
 The appellee in this instance is primarily responsible for this substitute service to the public. In Pick-Up and Delivery in Official Territory, 218 I.C.C. 441, the Interstate Commerce Commission said, on page 449:
"Respondents generally do not operate their own motor vehicles in their present pick-up and delivery service but employ trucking concerns to perform this service for them in accordance with written contracts. These concerns have an independent legal status and act as agents for the railroad company, which, as the principal, assumes full common-carrier responsibility for the complete transportation from store door to store door."
And, on page 482, this is said:
"* * * In considering somewhat similar questions we have heretofore expressed the view that the primary duty of the carrier is to furnish reasonable and adequate service and facilities, and that done, it has the right to choose its methods and its agencies, Transfer in St. Louis and East St. Louis by Dray and Truck, 155 I.C.C. 129, 143."
The Interstate Commerce Commission has held in many instances that railroads may choose their own methods and agencies for performing services for which they are responsible. See Off-Track Stations in St. Louis, 186 I.C.C. 578, 581; Norfolk Port Comm. C. & O. Ry. Co., 159 I.C.C. 169, 175. There appears to be no difference between the type of operation approved by the Interstate Commerce Commission in the above decisions and the arrangement approved by the Corporation Commission of Virginia in the instant case, nor does there appear *838 to be any difference between the Federal laws regulating interstate commerce and the Virginia laws dealing with intrastate commerce.
In Gulf, etc., Ry. Co. Miami Steamship Co., 86 F. 407, at page 416 the court says that a common carrier "may select its own agencies and its own associates for doing its own work. Atchison, etc., R. Co. Denver, etc., R. Co., 110 U.S. 667, 4 S.Ct. 185, 28 L.ed. 291." See United States Fruit Growers Exp. Co., 279 U.S. 363, 368, 49 S.Ct. 374, 73 L.ed. 739, and cases therein cited.
Clearly the Corporation Commission is empowered under the Constitution of Virginia to order the suspension of this transfer service by ferryboat and in lieu thereof provide the service by motor bus if the facts and circumstances warrant the change. This power is given the commission under section 156(b) of the Constitution of 1902 which provides:
"The commission shall have the power and be charged with the duty of supervising, regulating and controlling all transportation and transmission companies doing business in this State, in all matters relating to the performance of their public duties and their charges therefor, * * * and shall require them to establish and maintain all such public service facilities and conveniences as may be reasonable and just, * * *."
In construing this section of the Constitution in the case of Lynchburg Traffic Bureau Commonwealth, supra, at pages 619-620, we said:
"The purpose and effect of section 156 of the Constitution is to place all public service corporations under the supervision of the State Corporation Commission. Through that body they are subject to control and regulation. That such regulation and control rest in the Commission is made clear in Southern Ry. Co. Commonwealth, 128 Va. 176, 105 S.E. 65."
* * *
"All duties and obligations of serving the public imposed upon transportation companies by charter, franchise or legislative enactment are now subject to supervision and control of the State Corporation Commission, yet, in the exercise of its powers, the Commission may require that a public carrier establish, maintain and render only such service, facilities and conveniences as are reasonable and just. The duty of this Corporation, under all the facts and circumstances obtaining, is to afford such *839 transportation as is reasonably adequate to meet the public convenience and necessity. That is the legal yardstick by which appellee's duties and obligations must be measured."
* * *
"The scope of the powers accorded the Commission not only enables it to require the exercise and maintenance of adequate public service by a public service corporation, but authorizes it to relieve such company of the burden of public service when circumstances justify. Its broad and exclusive power in that respect was recognized and confirmed in Portsmouth Virginia Ry., etc., Co., supra [141 Va. 44, 126 S.E. 366]."
In the case of Commonwealth Staunton Mut. Tel. Co., 134 Va. 291, 302, 114 S.E. 600, it was held:
"The general purpose of the corporation clause of the Virginia Constitution of 1902 was to bring all public service corporations under the control of the police power of the State, and subject to the supervision of the State Corporation Commission."
In Portsmouth Virginia Ry., etc., Co., 141 Va. 44, 126 S.E. 366, the action of the commission in permitting the street railway company to abandon a portion of its line was upheld. It was said in that case, at pages 51-53:
"That a public service corporation cannot be compelled to consume its property in public service, and thus be forced to submit to confiscation, appears to be perfectly well settled."
"Among recent cases showing this is Brooks-Scanlon Co. Railroad Comm., 251 U.S. 396, 40 S.Ct. 183, 64 L.ed. 323; Mt. Carmel Public Utility, etc., Co. Public Utilities Comm., 297 Ill. 303, 130 N.E. 693, 21 A.L.R. 571."
* * *
"While we have never before had occasion to consider the authority of the Commission to permit the discontinuance of facilities theretofore devoted by transportation companies to the public service, its jurisdiction to grant such permission is based upon the same reasons and supported by the same authorities as the power which is as plainly vested in it to prescribe rates and to require facilities to be maintained."
The above discussions define the powers and duties of the commission in exercising the police powers of the State in the supervision and control of public transportation companies. The Act of 1894 of necessity yields to the Constitution of Virginia. *840 
Mr. Justice Miller in Lynchburg Traffic Bureau Commonwealth, supra,
said:
"In our opinion, section 156 of the Constitution, which defines the measure of duty resting upon public service corporations and bestows power upon the Commission to insure the performance thereof, or section 3716 (now | 12-14) of the Code, which puts into operation these constitutional provisions, do not conflict in any respect with the contractual or franchise obligation contained in the Act of 1878-79. However, if they do, the obligation imposed and resting upon appellee under that Act was with the State and therefore could be and was modified by the constitutional provision and subsequent legislative enactment carrying it into effect." (189 Va., at page 621.)
The sixth and last assignment of error reads as follows:
"(6) The Commission erred in entering its order of December 13, 1950, permitting the C&O to permanently discontinue the operation of its line of railroad between Newport News, Norfolk and Portsmouth, Virginia, by ferryboat."
This assignment covers the entire case. Appellants do not attempt in their brief to treat the assignments of error in order.
The point is stressed that the commission ignored the "vital distinction" between the performance of an absolute duty as contrasted with a relative duty. The pleadings filed by appellants do not raise this question. It is contended in their brief that the number of trips by train or ferry, or the accommodations afforded aboard the train or ferry are in the nature of the performance of a relative duty while the question of whether appellee "is operating a single passenger train or a single passenger ferry into Norfolk is in the nature of an absolute duty." Appellants cite the case of Southern Ry. Co. South Carolina Public Service Comm., 31 F.Supp. 707. This case denied the Southern Railway's request to abandon train service over a portion of its line. The opinion of Chief Judge Parker of the Fourth Judicial Circuit deals with relative and absolute duties of public service corporations, and he says: "This duty does not permit it (the railroad) to pick and choose and to serve only those portions of the territory which it finds most profitable, leaving the remainder to get along without the service which it alone is in a position to give." (Italics supplied.) In this case appellee is not abandoning the service, it is simply substituting one service for another. *841 
Appellants stress the point that the Norfolk area is thickly populated. Approximately a half million people live in the area and millions of visitors come to the area annually, yet it is evident from the record in this case that comparatively few people used the ferryboat service. The traveling public, and especially the local citizens, used some other mode of transportation.
Although the ferryboats had a carrying capacity in excess of 800 passengers, the record discloses that in 1949 an average of only 12.8 local passengers per trip used the ferryboat service, and from January 1, 1950 through June 4, 1950, an average of only 6.3 local passengers per trip made use of the boats.
Again quoting Mr. Justice Miller in Lynchburg Traffic Bureau Commonwealth, supra, "The public simply does not need, use or avail itself of the service offered by these trains * * *. Conditions, circumstances, means and modes of travel have vastly changed in comparatively recent years. * * * The availability of more and improved highways and the more extensive use of private automobiles and bus transportation have caused marked reduction in the need and demand for short-haul railway passenger service." (189 Va., at pages 622-623.) The same can be more forcefully said of the ferryboat service in this instance.
It is doubtless true as Dr. Temple testified that the ferry service provides a nice, short boat trip, and at times it is very enjoyable. The record in this case discloses however that it is an extremely expensive luxury paid for by appellee, and the commission was compelled to be just before it could be generous.
The reasoning of Judge Harrison in Norfolk, etc., R. Co. Interstate R. Co., 114 Va. 789, 795, 76 S.E. 940, applies with equal force in the case at bar. There, he said:
"The weight and force to be given the conclusions reached by the Corporation Commission is emphasized by the Constitution, which provides that the action of the Commission shall, on appeal, be regarded as 'prima facie just, reasonable and correct.' The finding of the Commission cannot, however, be disturbed in the case before us, unless the evidence clearly shows that the finding was unwarranted. This it does not do. On the contrary we are unable to see how the Corporation Commission could, with due regard to the rights of all parties, including the public, have reached a more just, reasonable and correct conclusion."
 The evidence amply supports the finding of the commission in this case, that the substitute motor bus service herein *842 provided meets the public convenience and necessity in the area, and the order of the commission, in view of the showing made in the record, is just and fair. To hold otherwise would be manifestly unreasonable and unjust and would approach the confiscation of property for a public service which is not used to an appreciable extent by the public.
The order of the commission is
Affirmed.