## · Richmond

### NEW YORK, PHILADELPHIA AND NORFOLK RAILROAD FERRY COMPANY v. COUNTY OF NORTHAMPTON AND OTHERS.

October 11, 1954.

Record No. 4211.

Present, All the Justices.

The opinion states the case.

*Benjamin W. Mears, Benjamin W. Mears, Jr., Windsor F. Cousins* and *C. A. Turner, Jr.,* for the appellant.

*E. Sclater Montague, B. Drummond Ayres, Baxley T. Tankard, Charles M. Lankford, Philip L. Hoag, Richard R. Lyman* and *Mulholland, Robie & Hickey,* for the appellees.

HUDGINS, C.J., delivered the opinion of the court.

The New York, Philadelphia and Norfolk Railroad Ferry Company, hereinafter designated the Railroad Ferry Company, in this appeal challenges the power or authority of the circuit court of Northampton county to compel it to continue indefinitely the ferry service it was rendering on February 25, 1953, between Cape Charles, Old Point Comfort and Norfolk, Virginia.

The historical background of this controversy is substantially as follows:

The New York, Philadelphia and Norfolk Railroad Company (not the Railroad Ferry Company) was chartered by the General Assembly of Virginia (Acts of 1871-2, p. 265; 1874, p. 87; 1881-2, p. 110; 1883-4, p. 115; 1899-1900, p. 325) to operate a railroad from the Maryland-Virginia line in Accomack county to some point in Northampton county, Virginia, and by ferry across the Chesapeake Bay to Norfolk. The railroad was completed to Cape Charles, Northampton county, in 1884 and transportation, including

ferry service via Old Point Comfort to Norfolk, began that year. The ferry across the Chesapeake Bay was operated by the New York, Philadelphia and Norfolk Railroad Company or one of its subsidiaries continuously without substantial interruption from 1884 to the first day of March, 1953.

The operation of the railroad and the ferry was taken over by the Pennsylvania Railroad Company, under a 999 year lease bearing date December 14, 1920. In addition, the Pennsylvania Railroad Company owned all the stock of the New York, Philadelphia and Norfolk Railroad Company.

The Railroad Ferry Company was granted a charter by the State Corporation Commission of Virginia on November 2, 1934. It was stated in the charter that the object of the corporation was to operate a ferry over and across the Elizabeth River, Hampton Roads, Chesapeake Bay, Little Creek and adjacent connecting waters from and to various places in Virginia, including Cape Charles, Old Point Comfort and Norfolk, when so authorized by law. The maximum authorized capital stock was $5,000, of which only $2,500 was issued, and this is owned by the New York, Philadelphia and Norfolk Railroad Company.

The Railroad Ferry Company in due course applied to the circuit court of Northampton county for a franchise to operate a ferry between the points named. On May 25, 1935, the franchise was granted by an order of the court, in which order the ferry company was required to comply with certain regulations imposed by the court, as authorized by code sections 33-186, 33-187, 33-188, and other pertinent sections.

The Railroad Ferry Company leased from the Pennsylvania Railroad Company three vessels, "Virginia Lee", "Pennsylvania", and "Maryland". It also leased from the Pennsylvania Railroad Company terminal facilities at Cape Charles and at Brook Avenue in Norfolk, and acquired a right to use the terminal at Old Point Comfort under permit from the United States Government, and continued to operate the ferry from September 1, 1935, until March 1, 1953.

The "Virginia Lee" was commandeered in 1942 by the United States Government for use in World War II. The "Pennsylvania" and the "Maryland" were sold in or prior to 1950. The Railroad Ferry Company in 1943 chartered the "Elisha Lee" from the United States Maritime Commission and used it in its ferry operations. This charter expired in 1948 and was renewed for an additional 5-year period, that is until November, 1953. For several years prior to March 1, 1953, the "Elisha Lee" was used to make two round trips daily in the ferry service. Its schedule was fixed to connect with the Pennsylvania Railroad trains at Cape Charles, transporting passengers and automobiles, and also freight in less than carload lots. Under the terms of the charter agreement, the Railroad Ferry Company agreed to pay $6,000 a year for use of the "Elisha Lee" and to maintain it. It appears from the evidence that due to the age of the "Elisha Lee" and damages sustained in stormy weather, the Railroad Ferry Company had been compelled to spend large sums in its efforts to keep the vessel seaworthy and to pass the annual Coast Guard inspections required by law.

In 1933, another company, the Virginia Ferry Corporation, was organized to operate a ferry across the Chesapeake Bay from Cape Charles to Little Creek in Princess Anne county. It leased from the Pennsylvania Railroad Company terminal facilities at each place. In 1949 the terminal at Cape Charles was moved to Kiptopeke, several miles south of Cape Charles in Northampton county. Four of the eight directors of the Virginia Ferry Corporation are directors of the Railroad Ferry Company. The vessels owned by the Virginia Ferry Corporation are covered by a mortgage held by a corporation which is wholly owned by the Pennsylvania Railroad Company. The terminal at Kiptopeke owned by the Virginia Ferry Corporation is covered by a mortgage held by a wholly owned subsidiary of the Pennsylvania Railroad Company.

Prior to the time this controversy arose, when it became necessary for the "Elisha Lee" to be taken out of ferry

service for repairs or for annual inspection by the United States Coast Guard, the Railroad Ferry Company had leased from the Virginia Ferry Corporation a boat for use as a substitute for the "Elisha Lee". The Railroad Ferry Company knew that on March 1, 1953, under the maritime law, the "Elisha Lee" would have to be inspected by the United States Coast Guard for its seaworthiness for further use in the ferry service. Some time prior to this date it began negotiations with the Virginia Ferry Corporation for the temporary use of one of its ferry boats with which to carry on its operation. The Virginia Ferry Corporation at that time refused to lease any of its boats to the Railroad Ferry Company because, it claimed, each of the five boats owned or leased by it was needed in its own operation. The Railroad Ferry Company also alleged that it was unable to acquire a suitable ferry boat from any other source.

The Railroad Ferry Company on February 10, 1953, posted notice at the county seat of Northampton county and other places stating that on the 25th day of February, 1953, it would apply to the circuit court of Northampton county for an order granting it leave to suspend indefinitely ferry service between Cape Charles, Old Point Comfort and Norfolk.

On February 13, 1953, notice was posted on the "Elisha Lee" and in the Railroad Ferry Company's terminals in Cape Charles, Old Point Comfort and Norfolk, signed by both the Pennsylvania Railroad Company and the Railroad Ferry Company, notifying the public that "effective March 1, 1953, ferry service between Cape Charles, Old Point Comfort and Norfolk" would be suspended. Prior to the 25th day of February, 1953, the Pennsylvania Railroad Company and the Railroad Ferry Company notified their ticket agents and various other employees that suspension of service would become effective on March 1, 1953.

Pursuant to notice given the public, the Railroad Ferry Company, on February 25, 1953, filed its petition in the court praying for leave to suspend indefinitely ferry

service between the points named. It was stated in the petition that the Railroad Ferry Company did not request at that time abandonment of its ferry operation and surrender of its franchise. The principal reason upon which the prayer was based was the inability of the Railroad Ferry Company to secure a suitable vessel for ferry service.

On February 25, 1953, when the Railroad Ferry Company moved the court for leave to file its petition for indefinite suspension of ferry service, the city of Hampton, the counties of Accomack and Northampton, the Eastern Shore Civic Association, the National Organization of Masters, Mates & Pilots, Brotherhood of Railway & Steamship Clerks, Freighthandlers, Express & Station Employees, Brotherhood of Railroad Trainmen & Brotherhood of Locomotive Firemen and Enginemen appeared by counsel and asked leave to intervene in the proceedings and to file answers in opposition to the suspension of ferry service. Counsel for the intervenors stated at the bar of the court that they had had no opportunity to read the Railroad Ferry Company's petition, and moved for continuance to give them a reasonable opportunity to prepare their defense.

The court, over the objection of the Railroad Ferry Company, allowed the parties named to become parties defendant to the petition. Before the court passed upon the motion for a continuance, the city of Hampton filed its demurrer to the petition and, at the same time, filed a petition of its own for a temporary mandatory injunction to compel the Railroad Ferry Company to continue its ferry service. The court overruled the demurrer and refused to grant the injunction, but it granted the intervenors' motion to continue the hearing on the merits until March 25, 1953. In the same order the court required and directed the Railroad Ferry Company to "continue its ferry service without interruption from Cape Charles to Old Point Comfort and Norfolk and return, as now established until the hearing of this matter on the merits, or until further order of the court. . . . "

The Railroad Ferry Company excepted to all the orders

entered by the court, and to that part of the order which required it to continue the operation of ferry service stated its ground for exception thus: "that the Coast Guard certificate for the 'Elisha Lee' would terminate on February 28, 1953, and it has exhausted every effort available to obtain another boat to make the operation."

On March 18, 1953, the Railroad Ferry Company filed in the clerk's office of the circuit court of Northampton county another petition, copies of which had been served upon counsel for the intervenors, in which it is stated that on March 1, 1953, it had been forced under the law to surrender the "Elisha Lee" to the Coast Guard for inspection and that the inspection revealed that it could not be reconditioned except by the expenditure of approximately $500,000; that during the nine years in which it had been operating the vessel it had incurred alteration and repair costs in the sum of $1,190,930; that, notwithstanding its endeavors to operate the ferry service as economically as possible, it had been unable to operate at a profit; and that during the period of its operation, between 1935 and January 1, 1953, it had incurred losses totaling $4,779,751.16; that during the year 1952 it had lost $411,852, which equals a daily loss of $1,125.27 for each of the 366 days. It was further alleged that the Railroad Ferry Company, in view of the situation, did not feel justified in making the expenditures necessary to put the "Elisha Lee" in condition to be approved by the Coast Guard for further service and "therefore, proposes to discontinue the ferry operation, as aforesaid, and respectfully requests this Honorable Court to enter an order terminating its ferry franchise."

On March 25, 1953, when the case was called for trial, pursuant to the order entered on February 25, 1953, various motions were made. The Railroad Ferry Company moved for the dismissal of its petition filed on February 25, 1953, praying for an indefinite suspension of ferry service, and requested a hearing on its petition to surrender its ferry franchise. On it being conceded that the Railroad Ferry

Company had failed to comply with the order of February 25, 1953, to continue ferry service, the appellees suggested that the Railroad Ferry Company was in contempt of court and had no right to further prosecute the case, and moved the court so to hold before permitting the Railroad Ferry Company to proceed further with the case. The court overruled all motions and stated that it would proceed to hear and determine the issues raised by the Railroad Ferry Company's petition for indefinite suspension, and the answers of appellees thereto. The court did not refuse to hear the Railroad Ferry Company on its petition to surrender its franchise, but stated that it would hear that matter on its merits at some future date.

The court then proceeded to hear the evidence offered in behalf of the parties on the petition and answers for the indefinite suspension of ferry service. The evidence for the Railroad Ferry Company is substantially that as hereinbefore stated. That for the appellees tends to show that the operation of the ferry in question is of special interest to citizens of Accomack and Northampton counties and to the citizens of Hampton, Newport News, and other sections of the peninsula lying between the York and the James rivers, as well as the public at large. Indeed, it appears to have been the main route of travel between Accomack and Northampton counties and the city of Richmond, the capital of Virginia. The route via Virginia Ferry Corporation from Kiptopeke and Little Creek to the Hampton-Newport News area is much longer, more expensive and involves several additional transfers.

Other evidence introduced by the appellees tends to prove that the "Elisha Lee" could have been put in seaworthy condition at much less expenditure than that stated by the witnesses for the Railroad Ferry Company, and that another vessel was available, namely, "John A. Messick", which was offered for sale for $350,000. It is stated that this vessel was in excellent condition and, for the expenditure of $62,670, could have been repaired and additions added

which would have made it entirely appropriate for use in the ferry service. Other evidence for the appellees tends to show that the Pennsylvania Railroad Company controls the purse strings of the Railroad Ferry Company, determines its policies and its operations, and that the Pennsylvania prior to the Railroad Ferry Company's filing its petition for the suspension of service had determined to abandon the ferry service. Hence, appellees say the petition was not filed in good faith. However, in the view we take of the case, it is not necessary to pass upon this phase of the controversy.

The court on consideration of this evidence and the voluminous exhibits filed by the respective parties refused to suspend indefinitely the ferry service, and ordered the Railroad Ferry Company to continue its ferry operation without interruption. The court further ordered that the petition praying for leave to surrender its franchise be consolidated with the petition already heard and continued the case generally.

A preliminary question is presented by appellees' motion to dismiss the appeal on the ground that none of the orders entered by the trial court was final, and for that reason was not appealable.

The trial court treated the two petitions, one for indefinite suspension of ferry service and the other for abandonment of the ferry franchise, as separate and independent cases. It did not consolidate the two petitions until after it had definitely decided to deny the Railroad Ferry Company's prayer for suspension of service. Thereafter, nothing remained to be done in the case praying for suspension of service, except to enter such orders as may have been necessary to enforce the judgment of the court.

The only issue raised by the pleadings was the right of the Railroad Ferry Company to suspend indefinitely the ferry service. The order denying the Railroad Ferry Company's prayer was final for it disposed of the whole subject-matter then before the court. *Owen* v. *Owen*, 157 Va. 580, 162 S. E. 46. Hence, the order was reviewable under Code,

section 8-462(1), which reads: "Any person who thinks himself aggrieved: (a) By any judgment, decree, or order in a controversy concerning, * * * (v) A mill, roadway, ferry, wharf, or landing * * * ," may present a petition for a writ of error.

The motion to dismiss is denied.

The decisive question presented is whether the trial court had the power or the authority to compel the Railroad Ferry Company to continue to operate its ferry indefinitely.

The Circuit Court of Northampton county has no inherent power as a court to grant a ferry franchise or to regulate and control the operation of a ferry. This is a legislative and not a judicial function. A ferry is an incorporeal hereditament acquired by special act of the legislature or by some other competent authority under the provisions of general statutory law. It comprises not only the exclusive privilege of transportation for tolls across a watercourse, but also the use for that purpose of the respective landings with outlets therefrom, without which the grant would be wholly nugatory. Before an applicant is entitled to a franchise he must satisfy the court that he owns the land or has contracted for the use of it at the points between which he proposes to operate the ferry. *Patrick* v. *Ruffners*, 2 Rob. (41 Va.) 210; Code, section 33-174.

The legislature has delegated to certain courts the power and authority, upon certain conditions enumerated in the statutes, to grant a ferry franchise. It has authorized the court which has venue of the application to require the proprietor of a ferry during the ferry operation to comply with certain rules and regulations prescribed. The various acts of the legislature concerning ferries, including ferries across the Chesapeake Bay, were codified in chapter 64 of the 1849 code, containing 32 numbered paragraphs. With comparatively slight changes, these acts are found in chapter 62 of the 1887 code, containing 33 sections, and in chapter 86 of the 1919 code, sections 2040 to 2072, inclusive. The same pertinent statutes are codified in the 1950 code under

title 33, chapter 3, articles I, II, III and IV, sections 33-162 to 33-201, inclusive.

When the court grants a party the right to operate a ferry the pertinent statutes give to such party a monopoly for the transportation of persons and property within an area of one-half mile of his ferry, with a right to collect in advance compensation for passage. The statutes authorize the court to prescribe the rate of ferriage (sections 33-163 and 33-186), the number and size of the boats to be used and how manned (section 33-188), and the schedule to be maintained (section 33-187).

The legislature has also prescribed the penalties for failure of a proprietor of a ferry to comply with the regulations imposed. Section 33-166 provides that if any proprietor of a ferry fails to give any person passage over the watercourse within a reasonable time, or fails to give adequate attention to the operation of the ferry, he shall be guilty of a misdemeanor and subject to a fine of not less than $2.50 nor more than $5.00.[1] A party who obtains leave to establish a ferry and fails to begin operation within the time fixed by the court forfeits all rights granted him by the franchise (section 33-179); if such proprietor ceases to operate his ferry for a period of 2 years and 6 months, he loses all rights under his franchise (section 33-162); section 33-167 provides: "If the proprietor of any ferry fails in any respect to comply with any section of this chapter, the circuit court of any county from which such ferry is established may adjudge and declare all his privileges in respect to such ferry at an end, after first causing such proprietor to be summoned to show cause against such order." *Sargeant* v. *Irving*, 2 Va. Dec. 338, 24 S. E. 344.

In 1946 the legislature added another penalty, section 33-203. This section provides that if the proprietor of a ferry for any reason is unwilling or unable to operate the

---

[1] Prior to 1922 the act provided that for such neglect of duty the proprietor should forfeit to the person denied passage not less than $2.00 nor more than $20.00. 1919 Code, sec. 2072, amended by 1922 Acts 741.

same, the Highway Commissioner, with the approval of the Governor, is authorized to seize all boats, equipment and other property used in the operation of the ferry and operate the same temporarily in the interest of the public.

These are all the penalties imposed by the legislature for the failure of a proprietor of a ferry to continue ferry operations, or for his failure to comply with the regulations imposed. Since the legislature has itself fixed the penalties for failure to operate a ferry in the manner required, or for failure to operate at all, no legislative agency, in the absence of express authority or by necessary implication from the language used, has power to impose any penalty other than those enumerated. In this case the court was acting as a legislative agent and not pursuant to the broad power or authority under which the court usually performs its judicial function.

Appellees contend that inasmuch as the operation of the ferry is a business clothed with public interest, the legislature has power and authority to compel the owner to continue operation until he obtains the consent of the legislature, or the legislative agency by which he obtained the franchise, to surrender the same. The legislature may have such power, but it has not exercised this power by the adoption of an appropriate statute, nor has it in express terms or by necessary implication from the language used delegated such power to the circuit court of Northampton county.

Appellees contend that this legislative mandate is expressed in section 33-183. This section provides: "Ferries shall continue as heretofore established from the counties of Accomack and Northampton to the cities of Norfolk and Hampton and to the town of Yorktown." This identical provision is found in the code of 1849, chapter 64, section 1; code of 1887, section 1361; code of 1919, section 2040. It neither enlarges nor diminishes the power or authority of the court. It was designed to give recognition and validation to ferries previously established and existing at the time this provision in the different codes became effective.

It would seem that the legislature, by specifying the penalties for failure to operate a ferry, intended to exclude the imposition of any penalty other than those prescribed. In *Hill Carter* v. *Commonwealth*, 2 Va. Cases (4 Va.) 354, the facts were that Hill Carter was indicted for failure to maintain a ferry across the James River from Shirley to City Point without having obtained permission from the county court of Charles City county so to do. He was found guilty by the trial court and fined $20. On review by this Court it was held that Carter was guilty of no offense. In so holding, the Court said: "The discontinuance is the penalty which the Law attaches to the failure of the Ferry-keeper to exercise his privilege of keeping the Ferry; and there is no Law which makes the discontinuance an offence, much less an indictable offence." The Court added that another act, section (b), "imposes a fine of two dollars, (to be recovered before a Justice of the Peace by Warrant,) on the keeper of a Ferry, for refusing to set over any person in a reasonable time after application to him made."

The facts in *Roper, et als.* v. *McWhorter, et als.*, 77 Va. 214, cited by appellees, are distinguishable from the facts in this case and required the application of a different statute. The facts in that case were that the county of Norfolk and the city of Portsmouth jointly owned the "Norfolk County Ferries" and the necessary docks, wharves, buildings and boats with which to operate. The statute authorized the ferries to be managed and regulated by a committee of six, three of whom were appointed by the judge of Norfolk county, and the other three by the judge of the Court of Hustings of the city of Portsmouth. The Board of Supervisors of the county and the council of the city, without the consent of the committee or of the county court of Norfolk, leased the ferries for a period of 12 years at an annual rental of $13,000. The committee of six and certain other citizens and taxpayers instituted suit against the lessors and lessees of the ferries to cancel and annul the lease on the ground that the board and the council acted *ultra vires* in executing it. The trial court held that the Board of Supervisors and the

council of the city of Portsmouth had no power to lease the ferries. On appeal, this Court, in approving the judgment of the trial court, said that the management and regulation of the ferry had been delegated by the legislature to the committee of six and that the board and the city council had no power, express or implied, to execute the lease in question. The Court further held that the right of disposing is not incident to the ownership of property held as a public trust and that the Board of Supervisors and the City Council, like other corporate bodies, were creatures of the statute and had no power other than that expressly or by necessary implication delegated to them.

Appellees further contend that the penalties prescribed by statute for failure of a ferry operator to comply with the requirements are not exclusive, and the agency or body which grants or supervises the franchise may compel the holder to continue to maintain and operate the ferry. In support of this contention 22 Am. Jur., Ferries, section 23, p. 567 and section 36, p. 575, are cited. In section 23 above, at p. 568, it is said that it is the duty of the proprietor of a ferry to comply with the conditions imposed, and "For failure to comply with such requirements, penalties are sometimes provided for, recoverable by the person injured; and, also, a forfeiture of the franchise may be authorized or the government may compel the holder to continue to maintain and operate the ferry." The author cites, in support of the text, *Brownell* v. *Old Colony R. Co.*, 164 Mass. 29, 41 N. E. 107, 29 L. R. A. 169, 49 Am. State Rep. 442. It appears from the opinion in that case that the Massachusetts statute expressly imposed the duty upon the operator of the ferry to continue operations whether it was profitable or not. The Court, in 29 L. R. A., at p. 171, said: "But, whatever may have been the obligation of the original ferry company, the Fairhaven Branch Railroad Company, when it made the ferry a part of its line, no longer had the power to discontinue the ferry, provided the legislature expressly required that it should be operated. . . . This statute makes it the imperative duty of the defendant to operate the ferry,

whether it is profitable or not." No such imperative duty is imposed upon the proprietor of a ferry in this Commonwealth.

"The scope and extent of the power of an inferior body to establish ferries and grant ferry privileges should be sought in the statutes conferring the power and must be exercised in conformity therewith. . . . The inferior body must act in strict conformity with the law by which its powers are conferred, and when its authority is limited any act done in excess of such authority is void. . . . " 36 C. J. S., Ferries, section 8(b), p. 684. This principle was applied in *Roper, et als.* v. *McWhorter, et als., supra.*

The Railroad Ferry Company exercising its rights under its franchise was performing a public service; hence, its operation was clothed with public interest. "When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use and must submit to be controlled by the public for the common good to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use, but so long as he maintains the use he must submit to public control." *Munn* v. *Illinois*, 94 U. S. 113, p. 126, 24 L. ed. 77.

In the absence of an express or necessarily implied statutory mandate, the proprietor of a ferry has a right to discontinue his ferry operation. See *Lucking* v. *Detroit Nav. Co.*, 265 U. S. 346, 44 S. Ct. 504, 68 L. ed 1047; *Brooks-Scanlon Co.* v. *R. R. Comm.*, 251 U. S. 396, 40 S. Ct. 183, 64 L. ed. 323; *Woody* v. *Port of Seattle*, 118 Wash. 163, 203 P. 59.

The decision in *City of Norfolk* v. *Chesapeake & Ohio Ry. Co.*, 192 Va. 828, 67 S. E. (2d) 99, cited by appellees, is not pertinent to the question raised in the instant case. This Court affirmed the judgment of the State Corporation Commission permitting the Chesapeake & Ohio Railway Company to discontinue its ferry service between Newport News and Norfolk and to substitute in lieu thereof transfer service by motor bus for passengers using its trains into and

out of Newport News. The ferry was simply a link in the intrastate and interstate operation of the Chesapeake & Ohio Railway Company as a common carrier. The Railroad Ferry Company operated both as a link in the Pennsylvania Railroad Company's intrastate and interstate commerce and as a part of a highway between the points named. In its former operation it is controlled by the State Corporation Commission and the Interstate Commerce Commission, but in its operation as a link in a public highway it is under the limited jurisdiction of the Circuit Court of Northampton county. The State Corporation Commission is given broad, general and extensive powers by section 156(b) of the Constitution in the control and regulation of a public service corporation. Such general and extensive powers are not delegated to the circuit courts in the regulation and control of ferries as links in highways. On the contrary, their powers of regulation are specifically enumerated and preclude the exercise of any power not expressly or by necessary implication delegated.

For the reasons stated, the order of the trial court is reversed and the case is remanded for further proceedings in conformity with the views herein expressed.

*Reversed and remanded.*